**William L. MICHELSON, Plaintiff,**

v.

**EXXON RESEARCH AND ENGINEERING COMPANY, Defendant.**

**Civ. A. No. 84–27 ERIE.**

United States District Court,
W.D. Pennsylvania.

Feb. 24, 1986.

See also, 588 F.Supp. 92.

Paul J. McArdle, Pittsburgh, Pa., for plaintiff.

John J. Myers, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for defendant.

## OPINION

GERALD J. WEBER, District Judge.

This case involving the termination of plaintiff's employment has a considerable history. One of our rulings on jurisdiction has been taken to the court of appeals. Trial on parallel claims in state court was completed in March 1985 and an appeal from that action has been decided by the Superior Court of Pennsylvania. Before us in this suit is defendant's motion for summary judgment which has twice been supplemented following state court decisions. We are satisfied that counsel have unearthed and presented all the relevant facts throughout the parallel action and the prior proceedings in this case and that no genuine factual issues exist. The questions of law are now ripe for determination under Rule 56.

## PROCEDURAL HISTORY

In January 1984, plaintiff filed this suit against two corporations and two individuals: Exxon Research and Engineering Company ("Exxon"), his former employer; A.W. Hanggeli, a supervisor at Exxon; International Colombia Resources Corporation ("Intercor"), a Delaware corporation doing business with Exxon; and Gustavo Arias, a Colombian citizen working in Boise, Idaho. We dismissed Intercor and Hanggeli on July 19, 1984 for lack of personal jurisdiction.[1] Since there is no proof that Arias has ever been served, plaintiff is left with four counts from his original complaint involving Exxon. These counts are based on theories of wrongful discharge, defamation, interference with contractual relations, and misrepresentation.[2]

Michelson filed a parallel suit for defamation in the Warren County Court of Common Pleas in January 1984 against one of his coworkers, James P. Kelly. Kelly authored a memorandum regarding plaintiff's job performance which lies at the heart of this dispute. That suit was tried in March 1985 and resulted in a verdict for Michelson. Kelly subsequently moved for a judgment n.o.v., however, and was successful.

## FACTUAL BACKGROUND

Exxon hired Michelson in 1976 as a materials inspector. In November 1982 he was assigned to conduct an inspection of locomotives at the General Electric plant in Erie, Pennsylvania. The locomotives were intended for use in a coal mining project in Colombia. Also present at the inspection was Gustavo Arias, an employee of Carbocol, an affiliate of the Colombian government which was a joint venturer in the project; two Exxon inspection trainees; and various other officials of Exxon, General Electric, and the joint venturers. On December 6, 1982, Kelly received a call from a fellow employee regarding complaints about Michelson's performance at the inspection. Upon speaking to Gustavo Arias, the complaining party, directly, Kelly was told some of the details of what allegedly had transpired during the November 1982 inspection. Kelly composed a one page memo summarizing the conversations.[3] The memo stated that Arias criti-

---

1. The Court of Appeals for the Third Circuit affirmed this decision in an unpublished opinion filed April 1, 1985. *Michelson v. International Colombia Resources Corporation*, 762 F.2d 993.

2. The jurisdictional basis for all counts has been diversity.

3. Verbatim, the memo reads:
 To: A.W. Hanggeli
 From: J.P. Kelly
 Subject: Inspection coverage in General Electric, Erie, Pennsylvania
 The following summarizes telephone conversations between myself and Mr. G. Arias, Cerrejon Project Engineer (Railroad). Mr.

Arias represents Exxon's partner, Carbocol, in the Cerrejon Coal Project, and is a member of the Project Management Team domiciled in Boise, Idaho.
 The subject conversation is the conclusion of Mr. Arias' observation of the ERE Inspector, Mr. W. Michelson, during functional testing of four 3600 HP railroad locomotives at General Electric in Erie, Pennsylvania, the week of November 15, 1982. Basically Mr. Arias was extremely critical of the inspector's actions during functional testing and his lack of basic knowledge of the equipment being tested. Reportedly, the inspector displayed an arrogant attitude in a defensive effort to overcome his obvious lack of experience and knowledge of such equipment and common

cized plaintiff for his lack of knowledge about locomotives, his attention to minor details rather than the substance of the testing, and his "arrogant attitude." Kelly also noted that, not being present, he could not verify the accuracy of Arias' statements. Kelly addressed the memo to Arthur W. Hanggeli, his immediate supervisor, and distributed copies to Hanggeli's supervisor, C.M. Stewart, R. Herkt, another of Kelly's superiors, and Daniel Dankos, Michelson's immediate supervisor.

Hanggeli pursued the matter by sending a copy of the memo to Michelson, who was out on sick leave, on February 8, 1983, and requesting a reply. Copies of this communication were sent to Dankos, and Hanggeli's own supervisors, John W. Leibold and Richard E. Willard.[4] Plaintiff did submit a reply.

While arguments about the status of this memo have been the focus of this case, plaintiff's other claims stem from his job

testing procedures (horsepower rating, electrical testing, track testing, etc.) General Electric attributes the lack of experience and unsatisfactory attitude of the inspector as the major obstacle in coordinating and performing the functional testing in a timely manner.

Mr. Arias further advises that during track functional testing the inspector devoted little time observing the test, monitoring personnel, and incidental items such as cab air conditioners, minor deviations of air pressure gages [sic] and defective painting occupied the majority of his time. "He devoted little or no time to the performance and functionability of the locomotives."

Subsequent to the above conversation, I spoke with the contractor's engineering representative who was also present during the locomotive testing, and whose observations of the inspector's actions generally parallels those of Mr. Arias.

It should be noted that the writer was not present during the referenced inspection visit and cannot verify the reported actions of our inspector.

We regret that performance of this type was exercised by one of our inspectors. Consequently, we request that in the future when an inspector is assigned to conduct inspection activities on behalf of this project, consideration be given to his qualifications in an effort to prevent a recurrence of such incidents.

If you have any questions or comments on this matter, contact me at Burlingame, California, on phone 415/579-4162.

termination in September 1983. In early 1983 Exxon decided to reduce the number of its employees allegedly because of a decline in business. Plaintiff argues that actually he was terminated in retaliation for filing workmen's compensation claims. He also has invoked the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., although inadequately. Exxon responds that Michelson was discharged because of his low performance rating.

## THE PARALLEL STATE PROCEEDINGS

Plaintiff sued J.P. Kelly in Warren County on three theories: misrepresentation, intentional interference with contractual relations, and defamation. Plaintiff withdrew the misrepresentation claim prior to trial. The trial court directed a verdict in favor of Kelly on the count of intentional interference with contractual relations. Plaintiff later moved for a new trial based on this ruling, but his motion was denied.

> JPK/njw
> cc: C.M. Stewart
> R. Herkt
> D. Dankos
> [At the top, this memo was marked:]
> "CONFIDENTIAL
> PRIVATE
> For the Personal Use of the Addressee"

4. Hanggeli's cover letter states:

> To: W.L. Michelson
> From: A.W. Hanggeli
> Subject: Inspection coverage in General Electric, Erie, Pennsylvania
> We refer to our February 2 conversation (WLM/DJD–AWH) in which we discussed your performance during the inspection of the railroad locomotives at General Electric Company, Erie, Pennsylvania. We outlined the allegations which have been made by Mr. G. Arias Cerrejon Coal Project's Railroad Engineer, who represented Carbocol (Colombia Government) during these inspections. As agreed, we are forwarding a copy of the document which refers to your performance. We shall await your formal reply which we request you expedite.
> s/ A.W. HANGGELI
> AWH:smh
> Attachments
> c: D.J. Dankos
> J.W. Leibold
> R.E. Willard
> [At the top this memo was marked:]
> "PRIVATE
> For the personal Use of the Addressee"

The jury returned a verdict for Michelson only on the claim of defamation. On Kelly's motion for judgment n.o.v., the trial judge granted the motion and overturned the verdict. Plaintiff appealed this decision to the Superior Court, which affirmed the trial judge on January 31, 1986.

In his motion for partial summary judgment here, filed before judgment n.o.v. was entered in favor of Kelly in state court, plaintiff admitted that his state suit "was brought upon a cause of action for defamation and upon the same facts as is the second count for [defamation] of the instant action." Docket Entry No. 58, par. 4. Defendant argues that this posture in two different courts constitutes unlawful splitting of plaintiff's actions.

 We start with the proposition that "if an agent is guilty of defamation, the principal is liable so long as the agent was apparently authorized to make the defamatory statement." *American Society of Mechanical Engineers v. Hydro Level Corporation*, 456 U.S. 556, 566, 102 S.Ct. 1935, 1942, 72 L.Ed.2d 330 (1982); Restatement (2d) of Agency, § 247 (1957). We have no doubt that defendant's agents were within the scope of their authority in their actions regarding the Kelly memorandum. The memo is from an employee to other employees concerning the performance of a third employee in transacting company business. But Exxon's liability for defamation is vicarious. It has authorized no acts independent of those of its agents as pleaded by plaintiff. Plaintiff has admitted that both the federal and state actions are based on these same facts, and necessarily would require the same proof. Plaintiff thus has sued the agent of defendant in state court, while asserting the same cause of action against the principal in this court based on the same occurrence. We conclude that plaintiff has wrongfully split his action as to claims based on Kelly's actions.

 But our decision that Exxon may not be vicariously liable for the same cause of action alleged against Kelly does not end its potential liability. Plaintiff also has claimed that he suffered injuries because of A.W. Hanggeli's distribution of the Kelly memorandum to his (Hanggeli's) superiors. According to Section 578 of Restatement (2nd) of Torts (1977), "One who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it." Plaintiff therefore would be entitled to show whether Exxon may be held vicariously liable for Hanggeli's actions despite our lack of personal jurisdiction over him.

Our decision that plaintiff has a separate vicarious claim against Exxon for Hanggeli's actions raises the question of res judicata. Plaintiff's state appeal, while pending, created troublesome issues of finality. *Bailey v. Ness*, 733 F.2d 279 (3d Cir.1984). The Superior Court recently issued its opinion that the memo was not capable of defamatory meaning, however, affirming the trial court's judgment. *Michelson v. Kelly*, No. 684, Pittsburgh 1985 (Pa.Super. January 31, 1986). Plaintiff has notified this court that he intends to seek allocatur from the Supreme Court of Pennsylvania based on this ruling. We find these considerations to be no obstacle to applying the principles of res judicata.

In *Bailey*, the plaintiff had been convicted of third degree murder in the Pennsylvania Court of Common Pleas. Following her conviction, she filed an action in federal court under 42 U.S.C. §§ 1983 and 1985 for deprivations of her civil rights arising out of the prosecutor's conduct during the trial. The district court dismissed her claim on the grounds of collateral estoppel, finding that the issues raised had already been resolved against her in state proceedings. An appeal from the criminal conviction was pending in the state Superior Court throughout her federal suit and appeal.

The Court of Appeals held that the district court should have stayed the action until final disposition in all available state courts or until such appeals were time-barred. Drawing guidance from other circuits, the court noted that dismissal in federal court subjected the plaintiff to the risks of statutory bars to her federal ac-

tion. "Thus, even if she should prevail in the state court appeal process, her victory would be meaningless unless her right to bring her civil suit is preserved." 733 F.2d at 282.

Nevertheless, we do not believe that *Bailey* controls this case. The Court of Appeals' rationale—the need to preserve separate federal rights—simply is not present here. The defamation count which we regard as having been finally determined for res judicata purposes is maintained in the state appeals process. We will give preclusive effect to the state court judgment, but unlike the district court in *Bailey*, we apply preclusion to the same cause of action, not to another cause of action secured by independent federal rights. Plaintiff's other counts—retaliatory discharge and age discrimination—will be considered on their merits here. This evidence is distinct from evidence of defamation, so the scope of preclusion is clear. Our application of res judicata will not expose plaintiff to any statutory bars or similar prejudice, so we find no reason under Pennsylvania law to stay decision on any of his claims in this court. *See also Kellner v. Aetna Casualty and Surety Co.,* 605 F.Supp. 326, 330 (M.D.Pa.1984).

APPLICATION OF RES JUDICATA

■ In Pennsylvania, the doctrine of res judicata requires the concurrence of four conditions: (1) identity in the thing sued for; (2) identity of the causes of action; (3) identity of persons and parties to the action; and (4) identity of the quality or capacity of the persons for or against whom the claim is made. *Bennett v. Erwin,* 325 Pa. 330, 189 A. 675 (1937); *Safeguard Mutual Insurance Company v. Williams,* 463 Pa. 567, 345 A.2d 664 (1975); *Del Boring Tire Service v. Barr Machine, Inc.* 285 Pa.Super. 66, 426 A.2d 1143 (1981). We have little doubt that all of the elements are satisfied in the case at hand. Plaintiff pleaded the same claims for defamation and tortious interference with contractual relations, rested on the same proof, and sought the same damages in his state suit. As to identity of the parties, defendant

here faces liability for republication of allegedly defamatory material by an employee, Hanggeli, not named in the state suit. As noted above, both Kelly and Hanggeli were acting within the scope of their duties in their actions involving the memo. Exxon's potential liability therefore is exclusively vicarious. Any judgment involving an employee for these acts would apply with the same effect to the employer, and vice versa. See Restatement (2d) of Judgments § 51 (1982). We thus find an effective identity of parties since both are bound by a judgment involving either of them. We now hold that the state court decisions against Michelson preclude his claims for defamation and interference with contractual relations stemming from Hanggeli's actions. *Lober v. Moore,* 417 F.2d 714 (D.C.Cir.1969); *Brobston v. Darby Borough,* 290 Pa. 331, 138 A. 849 (1927). We note in passing that we made a preliminary finding in our July 19, 1984 opinion that the memo is not capable of defamatory meaning, in agreement with the state court decisions on this point.

MISREPRESENTATION

Plaintiff pleaded but withdrew this count in his state suit. We need not determine the preclusive effect of these events because this claim is facially invalid.

The elements of fraudulent misrepresentation are:

1. A misrepresentation.
2. A fraudulent utterance.
3. An intention by the maker that the recipient will be induced to act.
4. Justifiable reliance by the recipient on the misrepresentation.
5. Damage to the recipient as the proximate result.

*Scaife v. Rockwell-Standard Corporation,* 446 Pa. 280, 285, 285 A.2d 451, 454 (1971), *cert. denied* 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1971); *Delahanty v. First Pennsylvania Bank,* 318 Pa.Super. 90, 464 A.2d 1243 (1983).

■ This cause of action is available to those who receive misrepresentations and

rely on such misrepresentations to their injury. Here, Michelson allegedly is the injured party, but Exxon must be considered the recipient which was induced to act in reliance on the memo. Plaintiff thus may not invoke this cause of action because he logically cannot satisfy the requirement that he himself must detrimentally rely on the alleged misrepresentation.

## THE JOB TERMINATION

### (a) Age Discrimination

■ In his September 10, 1984 brief opposing Exxon's motion for summary judgment, plaintiff for the first time invoked his rights under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* His original complaint rests only on the common law theory of wrongful discharge. He amended his complaint in March 1984. The amendment includes a paragraph alleging age discrimination, but again omits any mention of the ADEA. Instead, his pleading refers to his termination as a violation of the Pennsylvania Human Relations Act, 43 Pa.Stat.Ann. §§ 951, 952 (Purdon 1964). At a supplemental status conference held August 23, 1984, the court alerted plaintiff's counsel to his failure to plead an adequate ADEA cause of action. Docket Entry No. 47. Counsel responded by moving for leave to amend the complaint, but the motion mentions nothing about the grounds for amendment. Docket Entry No. 54. In essence, plaintiff asks the court to review his pleadings, alert him to any defects—which we have already done—and grant blanket leave to correct those defects so that his claim will be safe from attack. Suffice it to say that this is not our function. Federal Rule of Civil Procedure 15 requires liberal allowance of amendments when justice requires, but counsel at least must alert the court and opposing counsel to the substance of his proposed amendment. Despite repeated allowances, plaintiff has failed to plead an adequate cause of action under the ADEA.

■ Furthermore, it appears that plaintiff cannot bring an ADEA claim because the evidence of his compliance with administrative procedures is absent. The ADEA requires a prospective plaintiff to file charges with the Equal Employment Opportunity Commission ("EEOC") and to wait at least 60 days before he can bring suit in the district court. 29 U.S.C. § 626(d). Defendant has referred us to plaintiff's deposition testimony in which he admits to telephoning the EEOC once or twice but denies filing any charges. Michelson Dep. at 220–21, reprinted in defendant's Reply Brief. An affidavit by Eugene Reid, an EEOC employee, corroborates this testimony. Reid stated that the EEOC acknowledged the telephone calls by assigning them a charge number, but neither it nor Michelson pursued the matter. Docket Entry No. 52.

Plaintiff replied with an affidavit by Eugene Nelson, Pittsburgh Area Director for the EEOC, which seems to contradict the conclusion one might draw from the evidence above. Nelson states that plaintiff did file a charge against defendant. His opinion, though unbinding, is that Michelson's charge satisfied the ADEA jurisdictional requirements. Furthermore, Nelson sent a letter to Michelson in April 1984 informing him that his "charge was filed on September 21, 1983" and that he may proceed with a civil lawsuit. Docket Entry No. 53. Nowhere does Nelson state, however, that Michelson filed a written charge.

The Courts of Appeals for the Second, Fourth and Fifth Circuits have expressly held that notice to the EEOC must be in writing to satisfy ADEA requirements. *Reich v. Dow Badische Co.,* 575 F.2d 363, 368–69 (2nd Cir.1978), *cert. denied* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *Greene v. Whirlpool Corp.,* 708 F.2d 128, 130 (4th Cir.1983); *Woodard v. Western Union Telegraph Co.,* 650 F.2d 592 (5th Cir.1981). We have not found a similar decision from the Court of Appeals for the Third Circuit. The court has recently stated that, "In order to constitute a charge that satisfies the requirement of section 626(d), notice to the EEOC must be of a kind that would convince a reasonable person that the grievant has manifested an

intent to activate the Act's machinery." *Bihler v. Singer Company,* 710 F.2d 96, 99 (3d Cir.1983). While this language may be interpreted as encompassing oral complaints, the Court there was addressing the sufficiency of a letter to the EEOC as a substitute for formal written filing. The majority throughout its discussion obviously assumes that the charge is written. Furthermore, Judge Weis in dissent aptly quotes from a published EEOC notice which stated, "to be sufficient, a charge *shall be in writing* ...". 44 Fed.Reg. 37,974 (June 29, 1979) (our emphasis), reprinted at 710 F.2d 101. Consequently, even if plaintiff had pleaded an adequate ADEA claim, the record contains no evidence that he submitted some written document to the EEOC pertaining to his job termination. *Cf. Sutherland v. SKF Industries, Inc.,* 419 F.Supp. 610 (E.D.Pa. 1976) with *Pieckelun v. Kimberly-Clark Corp.,* 493 F.Supp. 93 (E.D.Pa.1980).

### (b) Retaliatory Discharge

In the second branch of his job termination count, Michelson alleges that he was terminated in retaliation for filing workmen's compensation claims. He filed three claims in November 1983, two regarding back injuries and one citing tuberculosis as an employment-related injury. On its face, this claim appears to suffer from a fatal flaw: plaintiff scarcely could be discharged in September 1983 in retaliation for compensation claims filed in November 1983. He is saved at this phase of the analysis, however, by documents showing that in July 1983, company officials were aware of the substance of his claims and his intention to seek workmen's compensation. Michelson Affidavit, Ex. 4, Docket Entry No. 50. He also retained a lawyer that same month. Docket Entry No. 51. Placing these facts in the light most favorable to plaintiff, we are satisfied that he has cleared the first obstacle in pleading this cause of action and that further analysis and scrutiny of evidence is warranted.

The area of common law remedies for wrongful discharge was opened by the Pennsylvania Supreme Court in *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974). Though holding favorably for the defendant, in a frequently cited pasasage the Court stated:

> there are areas of an employee's life in which his employer has no legitimate interest. An intrusion in one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened. The notion that substantive due process elevates an employer's privilege of hiring and discharging his employees to an absolute constitutional right has long since been discredited. But this case does not require us to define in comprehensive fashion the perimeters of this privilege, and we decline to do so. We hold only that where the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of action against his employer for wrongful discharge.

456 Pa. at 1814–815, 319 A.2d at 180 (footnote omitted).

In the absence of any description of the boundaries of this theory, the courts must determine case-by-case which public policies enjoy its added protection. The Superior Court of Pennsylvania has concluded that the obligation to serve jury duty is one such policy. *Reuther v. Fowler & Williams, Inc.,* 255 Pa.Super. 28, 386 A.2d 119 (1978). The Court of Appeals for the Third Circuit similarly has held that public policy protects an employee from discharge for refusing a polygraph test. *Perks v. Firestone Tire & Rubber Co.,* 611 F.2d 1363 (3rd Cir.1979).

A federal court in the position of expanding this theory must proceed with great caution. "One of the authentic obligations of federalism at the judicial level requires that we permit the state courts to decide whether and to what extent they will follow the emerging law." *Bruffett v. War-*

*ner Communications, Inc.,* 692 F.2d 910 (3rd Cir.1982). We must also pay close attention to the Commonwealth's policies and doctrinal trends. *Becker v. Interstate Properties,* 569 F.2d 1203, 1206 (3d Cir. 1977), *cert. denied* 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978). (footnote omitted).

We are guided by two trial court opinions on this issue. In *Butler v. Negley House, Inc.,* 20 D & C 3d. 543 (Allegheny County 1981), the court expressly held that a cause of action existed for discharge in retaliation for filing a workmen's compensation claim. Relying heavily on this opinion, the court for our adjoining district reached the same conclusion in *Rettinger v. American Can Co.,* 574 F.Supp. 306 (M.D.Pa.1983).

■ We are compelled to adopt the same result. First, we have little doubt that retaliatory discharge for filing workmen's compensation claims implicates an important policy. Through workmen's compensation, the state legislature has expressly provided for the welfare of employees injured on the job. It would be contrary to this scheme to permit employers to hang the threat of discharge over workers who otherwise would benefit from this program, on which so many of the Commonwealth's citizens rely. Second, the doctrine announced in *Geary* and applied in its progeny is grounded in the furtherance of such important public policies. Third, an employee in such a position has no statutory remedy. Pennsylvania courts have applied public policy exceptions in the area of wrongful discharge only when an injured party has no statutory remedy. *Hunter v. Port Authority of Allegheny County,* 277 Pa.Super. 4, 419 A.2d 631 (1980) (cause of action available for job applicant denied employment because of pardoned conviction); *Reuther, supra,* 255 Pa.Super. 28, 386 A.2d 119 (1978) (cause of action available for employee allegedly discharged for taking time off to serve jury duty). We thus elect to join the courts which have entertained a cause of action for a claim of wrongful discharge in retaliation for filing workmen's compensation claims.

■ While plaintiff may plead this cause of action, however, he cannot satisfy the court that he has any evidence to support it. We decided that evidence of defendant receiving notice before plaintiff's discharge about his intentions to file claims at least warranted a threshold analysis of whether such a cause of action even existed. But it is clear that this is the only fact plaintiff has developed regarding retaliatory discharge after all the prior proceedings in this case and its state companion. The other evidence favorable to defendant—excerpts from the affidavit of Anthony Maciulewicz, G.E. Manager of Sales Engineering, and unsworn statements of E.A. Johnson and R.E. Hoffman, inspection trainees, that plaintiff performed adequately at the locomotive inspection—has nothing to do with workmen's compensation. Docket Entry No. 50, Exs. 3 and 3A.

This absence of evidence leaves unchallenged defendant's alleged justification for discharging plaintiff. Defendant instituted a reduction in force in 1982 and 1983 because of declining business. Management decided to reduce the number of inspectors from 23 to 9. All employees were offered the opportunity to resign voluntarily through a program of special severance allowances. The voluntary program did not sufficiently reduce the number of inspectors, so Michelson and six others were involuntarily terminated. The decision was based on performance ratings. Inspectors were rated on a scale of one to four, with one being outstanding. All inspectors with a rating of 3.0 or below were subject to termination. Michelson had a rating of 3.0. Willard Affidavit, Docket Entry No. 45.

Plaintiff labels this a ruse, but he has produced no evidence to substantiate his charges and has only conclusorily attempted to discredit Exxon's defenses. This fatal shortcoming distinguishes the case from *Butler, supra,* and *Rettinger, supra.* In *Rettinger,* the plaintiff actually had filed a workmen's compensation claim almost two years before her termination. Furthermore, the court found the existence of a genuine issue of fact that the plaintiff's

production of affidavits might have resolved and from which the jury might have inferred a wrongful motive. In *Butler*, plaintiff specifically alleged that defendant refused to *rehire* her in retaliation for filing a compensation claim, which necessarily implies some action by the employer after plaintiff files his claim. Here, plaintiff has had the benefit of thorough discovery and has not produced evidence from which the jury could properly infer the retaliatory motive for discharge. He also has not discredited defendant's response of legitimate business reasons for his termination. We therefore will grant defendant's motion for summary judgment.