516 A.2d 706

**Richard A. SPRAGUE**

v.

**Greg WALTER, Kent Pollock, Howard Shapiro, Eugene L. Roberts, Jr., Creed C. Black, Michael Pakenham, Aaron Epstein and Philadelphia Newspapers, Inc. and Knight Newspapers, Inc.**

**Appeal of PHILADELPHIA NEWSPAPERS, INC.**

Superior Court of Pennsylvania.

Argued Feb. 20, 1986.

Filed July 31, 1986.

Reargument Denied Sept. 30, 1986.

572

Samuel E. Klein, Philadelphia, for appellant.

James E. Beasley, Philadelphia, for appellee.

Before BROSKY, POPOVICH and MONTGOMERY, JJ.

POPOVICH, Judge:

This is an appeal from a judgment of 4.5 million dollars entered against Philadelphia Newspapers, Inc. (PNI)[1] following a trial by jury in which the then First Assistant District Attorney of Philadelphia, Richard A. Sprague, was found to be defamed. We reverse in part and affirm in part.

1. It requires mentioning that all of PNI's outstanding stock is owned by Knight Newspapers, Inc., a litigant whose motion for a non-suit was granted following the presentation of Sprague's case-in-chief. As for the other defendants (i.e., Greg Walter, Kent Pollock, Howard Shapiro, Eugene L. Roberts, Jr., Creed C. Black, Michael Pakenham and Aaron Epstein), a stipulation was entered into whereby Sprague agreed to drop them from the case, with the condition that he be permitted the right to try the matter as though they were still parties to the suit.

PNI asks us to review the order of the trial court, affirmed by a court en banc, denying its motion for a new trial and/or judgment non obstante veredicto.

■ We will first deal with the denial of a new trial. The standard on which our review is premised in granting or refusing a new trial is one in which we will not reverse absent an abuse of discretion or error of law which controlled the outcome of the case. *Allison v. Snelling & Snelling, Inc.,* 425 Pa. 519, 229 A.2d 861 (1967).

We begin with a recitation of the facts sufficient to dispose of the claim raised and reserve until later a more detailed accounting upon review of the judgment n.o.v. issue.

In September of 1972, Greg Walter was adjudged guilty in municipal court of violating Pennsylvania's wiretap law (18 P.S. § 3742) for recording phone conversations while on the staff of the *Evening Bulletin.* The prosecutor was Richard A. Sprague, who recommended a sentence of fifteen days to one year imprisonment. An appeal was taken to Common Pleas Court, where, sometime in 1973, a stipulation was entered into, the sum and substance of which is not herein revelant.

Because of Walter's criminal status, his duties were curtailed by the *Bulletin.* This led to his securing employment with *The Philadelphia Inquirer,* which is published by PNI. One of Walter's first assignments occurred in the early part of 1973. An article by Walter appeared in a series of stories published by *The Inquirer* linking Sprague to illegal activity engaged in by members of the Pennsylvania State Police (then headed by Rocco Urella, Sr.). This supposed association was made by the discovery of an alias ("Nicholas Pratko") purportedly used by Sprague and exposed him to attack by impugning to him knowledge of and complicity in the activity, i.e., the wiretapping of the Pennsylvania Crime Commission's phones during its investigation of alleged corruption in the Philadelphia police department.

During the period the "Pratko" stories were being released, Walter also was working with another *Inquirer* reporter (Kent Pollock) in the investigation of a 1963 homicide of one John Applegate. Sprague, as Chief of Homicide for the District Attorney's Office, handled the matter which culminated in the two suspects (Rocco Urella, Jr. and his classmate, Donald Scalessa) being released.

With the resurrection of the Applegate case and Sprague's refusal to submit to questioning by Walter and Pollock because of asserted statements attributed to them that they were out to "smear" him, *The Inquirer* decided to proceed to publish a number of articles in April of 1973 (credited to Walter and Pollock) detailing, and placing under scrutiny, Sprague's role in light of his "very close" ties with Rocco Urella, Sr., the father of one of the suspects.

Sprague filed a complaint in trespass contending that he had been libelled by the various articles and editorials appearing in *The Inquirer*. Following a trial which lasted approximately eight weeks and generated over four thousand pages in testimony, a jury awarded Sprague 1.5 million dollars in compensatory damages and 3 million dollars in punitive damages. This timely appeal was filed thereafter.

The first issue centers upon the propriety of the trial court's determination that PNI did not have the right to refuse to disclose its sources of information, and, upon failing to do so, all information related thereto was excluded from the jury's consideration.

The facts leading up to the exclusion start with Kent Pollock testifying on direct examination that the first he learned of Applegate was from a "source" who was very close to the Urella family. At this point in his testimony, the trial court interjected, "Who?" Counsel for Sprague seized the opportunity to seek a response to the question, while PNI's counsel objected. The matter was taken up in chambers.

Counsel for PNI argued that under Pennsylvania's Shield Law (42 Pa.C.S. § 5942(a)) Pollock should be allowed to

testify fully as to the information garnered from the source without having to divulge his/her identity, nor should any adverse inference be drawn from his exercise of this statutory and First Amendment privilege. Further, PNI's counsel contended that, to the extent that the exercise of this privilege would hinder the plaintiff's ability to scrutinize the genuineness of the source, a balance had to be struck in favor of preserving the identity of the source, otherwise the purpose of the Shield Law, i.e., to encourage the free flow of information, would be undermined.

Counsel for the plaintiff, on the other hand, envisioned the Shield Law as no more than an investigative tool, the effect of which dissipated once the information conveyed by the confidential source was placed in print. Also, he felt that if a source signed an affidavit in support of the information given, this constituted a waiver of the privilege. Lastly, counsel for the plaintiff asserted that the remedy for failure to reveal a source should be an "adverse inference charge" by the court.

In response to the assertions of counsel, the trial court entered the following order:

... the Court determines that in this case the Shield Law is inapplicable and that the defendants have no constitutional right to refuse to reveal its sources. Therefore, it is ordered that the defendant disclose its sources.

If the defendant chooses not to reveal their sources, it is precluded from defending this action on the grounds that the articles in suit, or any portion thereof, were based upon information received from a reliable, but undisclosed source.

In order to implement this Order, all evidence of what information defendants received from allegedly reliable, but undisclosed sources, shall be excluded.

PNI's attempt to secure extraordinary relief from the Supreme Court of Pennsylvania was "denied without prejudice" in a per curiam order. The trial resumed thereafter, and the instances in which PNI's witnesses (Pollock and Robert J. Terry, also a reporter for *The Inquirer*) invoked

the privilege of the Shield Law, so as not to reveal the identity of their sources, occurred during their cross-examination and numbered 26 in total.

It was a month-and-half into the trial, and two witnesses short of PNI completing its case, before the court and the parties discussed in chambers what evidence would be kept from the jury's consideration because of the June 13, 1983 order relating to the Shield Law. After this conclave, the jury was instructed to disregard the testimony of certain witnesses because of sources that were not disclosed. The court also told the jury that the defendant(s) did not have a right to refuse to reveal its sources, and, for doing so, "all evidence of what information defendants received from allegedly reliable, but undisclosed sources, shall be excluded."

The court proceeded to particularize the information that the jury was to ignore in its deliberations for the failure of the witnesses to disclose their sources in direct violation of his order:

First—Prosecution Memorandum (Exhibit P-3-2). This was testified to by Pollock as having been obtained from a source he refused to reveal. (This document was sent by the Pennsylvania Attorney General's Office to the District Attorney of Montgomery County, which was the location of a motor lodge where the State Police wiretapping of the Pennsylvania Crime Commission took place; and the first Pollock learned of the name "Pratko"—which was associated with Sprague, was from this instrument.)

Second—Any information with respect to the statement in *The Inquirer* article of April 1, 1973 that read: "Subsequent to the homicide, Sprague boasted to at least one of his friends that he 'could get anything I want from Rocco Urella,' according to a sworn statement by the friend obtained by The Inquirer."

Third—The language in the April 1, 1973 article to be deleted from consideration read: "Sprague's involvement with Urella Sr. became evident four days after

the wiretaps were discovered when The Inquirer learned[ ] Sprague spent an entire day in conference with Urella at Urella's Delaware County home."

Fourth—Pollock's testimony of a contact close to Urella family who told him certain alleged things. Refusal to reveal source required exclusion of any evidence in respect to this statement.

Fifth—Terry's testimony that he had a source check police records to determine whether Applegate had criminal record was likewise to be removed from the jury's consideration.

At the close of the case, the court repeated its Shield Law directive and instructed the jury to "strike" from its consideration certain portions of the evidence. Numerous objections were lodged and denied; in particular, we cite counsel for the plaintiff's request that, as to the Shield Law, the jury should have been charged that "their failure to reveal sources would warrant a finding that there were ... no sources; and therefore, that would constitute known falsity."

After the jury entered a verdict in favor of Sprague, timely post-verdict motions were denied, and judgment was affirmed by a court en banc (Judge Carson, dissenting).

The court below, in support of its decision that the Shield Law was inoperative to the facts, looked to a variety of material, one of which was the Pennsylvania Constitution, Art. 1 §§ 7 and 11. Perforce, the court interpreted § 11 "as creating a constitutional right to defamation." This precise argument was rejected recently in a 5–4 decision by this Court, sitting en banc. See *Hatchard v. Westinghouse Broadcasting Co.*, 350 Pa.Super. 1, 18–21 n. 12, 504 A.2d 211, 220–21 at n. 12 (1986), allocatur pending; see also *Coughlin v. Westinghouse Broadcasting and Cable, Inc.*, 780 F.2d 340 (3rd Cir.1985).

The *Hatchard* majority concluded that the provisions of the Constitution mentioned above did not entitle a litigant access to a reporter's notes and other documentary material, as well as "outtakes", in the preparation of a libel suit

against a news-media-defendant. Simply stated, the Court was not able to "agree that any of the constitutional provisions cited [, i.e., Art. 1, §§ 1, 7 & 11,] ... create[d] any right to bring a defamation action ...." *Id.* Accord *Mazzella v. Philadelphia Newspapers, Inc.*, 479 F.Supp. 523, 528–29 (E.D.N.Y.1979).

The court also invites our attention to *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), a case in which the United States Supreme Court held that the First Amendment did not preclude a plaintiff's inquiries into the editorial processes leading to publication of an allegedly defamatory television program. However, we do not read anything in *Herbert v. Lando* to vitiate our ability to interpret the Pennsylvania Shield Law. The Court there merely stated that the First Amendment does not afford a privilege to withhold editorial processes. As is relevant here, we note that there was no shield law in question before the high Court.

More on point, we believe, is the decision of *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The issue there was the obligation of reporters to respond, under grand jury subpoenas, to questions relevant to an investigation into the commission of crime. The Court ruled that there was no constitutionally protected right to refuse to appear before a grand jury. Of interest to us is the manner in which the Court dealt with Branzburg's contentions.

The petitioner-Branzburg was a staff reporter for a daily newspaper in Kentucky which carried a story, under his byline, detailing his observation of two individuals synthesizing hashish from marijuana. A photograph of the hands of these individuals was included, and the article recited that the petitioner had promised not to reveal the identity of these two. When the petitioner was subpoenaed by the county grand jury, he appeared, but refused to identify the individuals involved. A state trial judge ordered the petitioner to answer the questions posed and rejected his contentions that the Kentucky reporters' privilege statute (substantively similar to Pennsylvania's Shield Law), the First

Amendment or specific sections of the Kentucky Constitution authorized his refusal to answer.

On appeal, the Kentucky Court of Appeals affirmed on the basis that, inter alia, its shield law did not offer someone a privilege to refuse to testify about events he had observed. Although the United States Supreme Court agreed, it is important to remember the Court's caveat that it was "powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege, either qualified or absolute." 408 U.S. at 706, 92 S.Ct. at 2669. This is exactly what we are doing here. Except, we find it unnecessary to embark on an analysis of our Constitution to decide whether the relief sought by PNI is permissible, for it is clear to us that in enforcing the privilege enacted by the Shield Law, we are to construe the statute broadly. See, e.g., *Lal v. CBS, Inc.*, 726 F.2d 97, 100 (3rd Cir.1980); *In re Taylor*, 412 Pa. 32, 40, 193 A.2d 181, 185 (1963). Thus, to the extent the court below wishes us to follow the lead of the State of New York, which condoned the preclusion of a media-defendant's use of any of its sources and information as proof of verification or evidence of responsibility when it opted to rely on its statutory privilege—shield law (see *Greenberg v. CBS, Inc.*, 419 N.Y.S.2d 988, 997, 69 A.D.2d 693 (1979)), we decline the invitation. To the same effect see *Newton v. NBC*, 11 Media Law Reporter 1950 (D.Nev.1985).

It is beyond cavil, as urged and relied upon by the court below, that the ruling at *In re Taylor, supra*, in which the scope of the precursor of the present Shield Law[2] was being construed, contained the following verbiage:

> The language of each Constitution [, i.e., state and federal,] is clear, and by no stretch of language can it

**2.** The then Act of 1937, as amended, pertinently provided in § 1: "No person, engaged on, connected with, or employed by any newspaper of general circulation as defined by the laws of this Commonwealth, * * * for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person,

protect or include under "freedom of the press," the non-disclosure of sources of information.

412 Pa. at 39, 193 A.2d at 184. If we were to proceed no farther in our reading, we might be inclined to agree with the court below sanctioning PNI for its election not to disclose its sources. We do not because one must "read on" to secure the full meaning of the decision.

One learns that the media-defendant's right of non-disclosure was predicated upon the shield law, a statute which the Court repeatedly cautioned should be construed broadly so as to avail anyone invoking its privilege the right of non-disclosure with respect to "any source of any information". The defendant implemented the privilege to avoid having to disclose its sources to a grand jury investigating crime. This would appear to be consistent with the later ruling of *Branzburg v. Hayes, supra.*[3] Accord *Maressa v. New Jersey Monthly,* 89 N.J. 176, 445 A.2d 376, 383 (1982), *cert. denied,* 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982).

The *Taylor* Court was quite emphatic in its belief that:

in any legal proceeding, trial or investigation before any court, grand jury, traverse or petit jury, or any officer thereof, * * *."
The present Pennsylvania Shield Law provides:
**§ 5942. Confidential communications to news reporters**
(a) **General rule.**—No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.
42 Pa.C.S. § 5942(a).

3. The portion of the text of the *Branzburg* opinion relied upon reads: There is also merit in leaving state legislatures free, within First Amendment limits, to fashion their own standards in light of the conditions and problems with respect to the relations between law enforcement officials and press in their own areas. It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to require a newsman's privilege, either qualified or absolute. 408 U.S. at 706, 92 S.Ct. at 2669. See also Note, Reporters and Their Sources: The Constitutional Right to a Confidential Relationship, 80 Yale L.J. 317 (1970).

It is a matter of widespread common and therefore of Judicial knowledge that newspapers and news media are the principal source of news concerning daily local, State, National and international events. We would be unrealistic if we did not take judicial notice of another matter of wide public knowledge and great importance, namely, that important information, tips and leads will dry up and the public will often be deprived of the knowledge of dereliction of public duty, bribery, corruption, conspiracy and other crimes committed or possibly committed by public officials or by powerful individuals or organizations, unless newsmen are able to *fully and completely* protect the sources of their information. It is vitally important that this public shield against governmental inefficiency, corruption and crime be preserved against piercing and *erosion.*

412 Pa. at 41, 193 A.2d at 185 (Emphasis added in part; footnote omitted). This tenet has been most recently re-affirmed by our Supreme Court in *Hepps v. Philadelphia Newspapers, Inc.,* 506 Pa. 304, 485 A.2d 374 (1984), rev'd on other grounds — U.S. —, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), albeit in dicta (see *Hatchard, supra* ), to embrace the libel arena.

The United States Supreme Court reversed the *Hepps* decision so as to require a private individual-plaintiff to prove falsity in a defamation action. In the course of doing so, it recounted that during the Common Pleas Court trial, *The Inquirer* took advantage of Pennsylvania's Shield Law on a number of occasions, with the result that the trial court refused to give a charge benefitting either side on the ramifications of invoking the privilege. This fact was grasped by our Supreme Court as a trade-off for continuing to place the common law burden of proving truth on *The Inquirer,* since it felt that the law of libel was heavily weighed, already, in favor of the media-defendant. The United States Supreme Court did not agree that the libel scales were unnecessarily tipped toward the media-defendant and decided to shift the burden of proof as to "actual

malice" (a concededly high obstacle to hurdle) back to the plaintiff.

The question arises: Is the trial court's remedial (exclusionary) measure tantamount to returning the scales in libel cases to a posture other than that set by the United States Supreme Court in *Hepps?* It would be if one equates the requirement that the defendant disclose its "sources" (going forward with the evidence) to be a prod, in essence, to prove the truth of the articles or suffer the consequences of exclusion. We deem it to be.

It is obvious to this Court that the plaintiff in *Hepps* was not to be accorded any preferential, procedural treatment by requiring the defendant to bear the burden of proving falsity to resolve a perceived imbalance in the law of libel when it came to proof. The Pennsylvania Supreme Court's belief to the contrary, its attempt to ameliorate the situation by pointing to the use of the Shield Law by the defendant as an equalizer, although not endorsed by the United States Supreme Court, was not condemned as constitutionally infirm. This is evident from the Court's remark that, "[i]n the situation before us, we are unconvinced that the State's shield law requires a different constitutional standard than would prevail in the absence of such a law." — U.S. at —, 106 S.Ct. at 1565. Thus, the Shield Law was stated to have no appreciable affect on the burdens of proof as the case stood before the high Court, which obviously was cognizant of the role played by the statute at trial without the attending exclusion of "source" evidence from the jury's purview.

To sanction the trial court's procedural recourse would be, we believe, to invalidate Pennsylvania's long-standing practice of establishing rules of evidence and privilege by legislative action. See *Coughlin v. Westinghouse Broadcasting and Cable, Inc.,* 603 F.Supp. 377, 381 (E.D.Pa.1985), aff'd 780 F.2d 340 (3rd Cir.1985). Moreover, to conclude otherwise would be in derogation of our Supreme Court's admonition in *Taylor* to guard against an "erosion" of the Shield Law. In the same vein, we find the offer made to

PNI by the trial court, i.e., either disclose your sources or suffer the loss of *all* evidence related thereto being considered by a jury on the question of liability, to be no choice at all—a Hobson's choice. See *Taylor,* 193 A.2d at 186 (Redacting the informant's name from documents and then making them available to other side was felt by the Court "realistically" to nullify the object and intent of the shield law).

■ We hold that the trial court, by excluding relevant evidence from the jury's bailiwick was, in effect, "exacting" a penalty upon the defendant for its exercise of a statutory right,[4] and trying to accomplish by indirection what it could not achieve directly. See *Branzburg, supra,* 408 U.S. at 681, 92 S.Ct. at 2656–57; *Jamerson v. Anderson Newspaper, Inc.,* 469 N.E.2d 1243, 1250 (Ind.App.1984).

Furthermore, Sprague's contention that PNI's position would permit it to use the Shield Law as a "sword", resulting in a deprivation of his due process rights to explore the reasonableness of the reporters' pre-publication actions is not persuasive. See *Coughlin, supra,* 780 F.2d at 342 ("Shield Law does not ... result in a denial of due process in violation of the fourteenth amendment of the United States Constitution.").

To the extent that the New York Supreme Court takes a different approach to resolve this vexing set of circumstances, see *Greenberg v. CBS, Inc., supra,* we prefer to retain the spirit of our Shield Law intact and not debilitate it by veiled attempts to strike a balance in an area which we believe is best left to the Legislature to resolve, as has been the case in one state. See Tenn.Code.Ann., Sec. 24–1–208(b), wherein the absolute privilege of the shield law is rendered nugatory "with respect to the source of any allegedly defamatory information in any case where the

---

**4.** We mention for edification purposes that it is not the practice in this Commonwealth to resort to the use of an adverse inference to neutralize one's invocation of any of the other statutorily created privileges relating to non-disclosure. See 42 Pa.C.S. § 5923 (Spouses); 42 Pa. C.S. § 5928 (Attorney—Client); 42 Pa.C.S. § 5929 (Doctor—Patient); 42 Pa.C.S. § 5943 (Priest —Penitent).

defendant in a civil action asserts a defense based on the source of such information." For an analogous setting see *Hatchard, supra* at 222 n. 12.

Of the 26 states which currently have Shield Laws,[5] 8, including Pennsylvania, have what has been described as "the 'ultimate' in news media protection; that is, the press has a seemingly unassailable privilege not to disclose the source of any information obtained in the course of employment." *Jamerson, supra,* 469 N.E.2d at 1248 & n. 3. This preference for and continued endorsement of the privilege in this Commonwealth is evidenced by the Legislature's re-enactment of the 1937 statute without substantial change in July of 1976. See note 2, *supra; Hatchard, supra; Jamerson, supra;* see also *Coughlin, supra,* 603 F.Supp. at 380 n. 3.

We are unpersuaded by the course taken by some sister states in this sensitive and always volatile cauldron of the law.[6] We think it prudent to maintain the status quo, i.e.,

5. See Ala.Code § 12–21–142 (1975); Alaska Stat. §§ 09.25.150–.220 (1983 & Supp.1984); Ariz.Rev.Stat.Ann. § 12–2237 (1982); Ark.Stat. Ann. § 43–917 (1977); Cal.Evid.Code § 1070 (West Supp.1985); Del. Code Ann. tit. 10, §§ 4320–4326 (1974); Ill.Ann.Stat. ch. 110, §§ 8–901 to –909 (Smith-Hurd 1984); Ind.Code Ann. § 34–3–5–1 (Burns 1973 & Supp.1984); Ky.Rev.Stat.Ann. § 421.100 (Baldwin 1979); La.Rev.Stat. Ann. §§ 45:1451–1454 (1982); Md.Cts. & Jud.Proc.Code Ann. § 9–112 (1984); Mich.Comp.Laws Ann. § 767.51 (West 1982); Minn.Stat. §§ 595.021–025 (1982); Mont.Code Ann. §§ 26–1–901 to –903 (1983); Neb.Rev.Stat. §§ 20–144 to –147 (1977); Nev.Rev.Stat. § 49–275 (1981); N.J.Stat.Ann. § 2A:84A–21 to –21.9 (West Supp.1984–1985); N.M.Stat.Ann. § 38–6–7 (Supp.1984); N.Y.Civ.Rights Law § 79–h (McKinney 1976 & Supp.1984–1985); N.D.Cent.Code § 31–01–06.2 (1976); Ohio Rev.Code Ann. §§ 2739.04–.12 (Page 1981); Okla.Stat. tit. 12, § 2506 (1981); Or.Rev.Stat. §§ 44.510–540 (1983); 42 Pa.C.S. § 5942 (1982); R.I.Gen.Laws §§ 9–19.1–1 to –3 (Supp.1984); Tenn. Code Ann. § 24–1–208 (1980).

6. There is anything but consistency as to the ramifications that flow from the refusal to disclose one's source. See *Greenberg v. CBS, Inc., supra; Dowd v. Calabrese,* 577 F.Supp. 238, 244 (U.S.D.C.1983), both of which attempt to solve the dilemma without going to the extreme of presuming the non-existence of sources, as has occurred with two non-shield states—New Hampshire and Hawaii. See *Downing v. Monitor Publishing Co.,* 120 N.H. 383, 415 A.2d 683 (1980); *DeRoburt v. Gannett Co.,* 507 F.Supp. 880, 884 (D. Hawaii 1980); Cendali, Note: Of Things to Come—The Actual Impact of *Herbert v. Lando* and a

use of the Shield Law and evidence related thereto, which has been viewed by the United States Supreme Court in *Hepps* without any voiced objection by a majority of that Court.[7] Our approach is no less inimical to the plaintiff than presently exists under *Hepps*. This is reflected in the cogent observations of Circuit Judge Becker in his Concurring Opinion in *Coughlin:*

> ... although the Shield Law affects the *manner* in which plaintiffs [sic] may develop evidence to support his defamation claim, it does not make successful defamation claims impossible. Plaintiff may use other evidence, both direct and circumstantial, to substantiate his claim. Admittedly, the plaintiffs' [sic] case is made much more difficult by the Shield Law, but that reflects a choice by the state legislature that it is not within our power to upset.

780 F.2d at 349 (Emphasis in original). See also *Samuelson v. Susen,* 576 F.2d 546, 553 (3rd Cir.1978) ("No doubt the statutory provisions affect the manner in which plaintiff may develop evidence to support his defamation claim. Plaintiff is not, however, foreclosed from prosecuting his claim with other evidence, both direct and circumstantial." Cited with approval by the District Court in *Coughlin, supra* at 382). In addition, we see merit in the suggestions of PNI in its brief to us at page 48, wherein it wrote on the subject that:

> The proper course ... would have been to permit the reporters to testify, and be cross-examined, about all information they had at their disposal prior to publication of the articles in suit. To the extent that the reporters declined to identify the sources for certain portions of the information they had obtained, the jury would be called

Proposed National Correction Statute, 22 Harv.J.Legis. 441, 460–63 (1985).

**7.** This position, we believe, is buttressed by the fact that the 5–member majority in *Hepps* was not swayed by the argument of the dissenters, which is similar to the complaints voiced by the plaintiff here, that "[l]ack of knowledge about third parties ... may make it impossible for an honorable person to disprove malicious gossip...." 106 S.Ct. at 1569.

upon, as it is in all cases, to gauge the credibility of the witnesses and their testimony based upon the tests of credibility to be applied to the testimony of any witnesses. Thus, the jury would be free to believe or disbelieve the reporters' testimony concerning the existence and reliability of confidential sources.

We are not insensitive to the position of the plaintiff, given his status as a "public official" for purposes of this case and the attendant heavy burden placed upon him by *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), considered difficult, if not impossible, to discharge by some. See *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 769–770, 105 S.Ct. 2939, 2951, 86 L.Ed.2d 593 (1985) (Concurring Opinion of Justice WHITE). Our decision is made all the more difficult because of the countervailing forces at work, each trying to protect and preserve whatever liberty and property interests remain in the wake of *Sullivan* and the Shield Law. Nonetheless, make one we must.

■ Mindful that freedom of the press is a fulcrum upon which some of our cherished liberties hinge, we have considered the well-written briefs of both sides, the thoughtful and incisive opinion of the court en banc and conclude that, at least in this jurisdiction, the statutory and case law condone the use of testimony to explicate when, where and how information is garnered without the correlative requirement of source-disclosure by a back-door approach excising evidence from a trier-of-fact's consideration for failure to identify one's artery of information. To remedy the error of law, a new trial is warranted.

We next proceed to evaluate the denial of PNI's judgment n.o.v.

Our task is to make an independent [8] examination of the evidence adduced to determine if it was constitutional-

---

8. As stated more fully in the recent case of *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510–11, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984):

ly sufficient to warrant a finding by the jury of actual malice, and in so doing, the evidence, together with all reasonable inferences therefrom, must be considered in the light most favorable to the verdict winner, here the plaintiff. If it is not sufficient, [the defendant] is entitled to judgment n.o.v.

*Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 458, 273 A.2d 899, 912 (1971).

 Before proceeding further, it requires mentioning that Sprague's position as First Assistant District Attorney for Philadelphia County in 1973 rendered him a public official. *Curran v. Philadelphia Newspapers, Inc.*, 497 Pa. 163, 439 A.2d 652 (1981). Accordingly, the plaintiff, in order to recover, had to establish that PNI published[9] the

The requirement of independent appellate review reiterated in *New York Times v. Sullivan* is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is law in its purest form under our common law heritage. It reflects a deeply held conviction that judges—and particularly members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice." See also Monaghan, Henry P., Constitutional Fact Review, 85 Colum. L.Rev. 229 (1985).

9. No one disputes that the reporters under fire were employed by PNI, that the executive editor personally reviewed with Pollock the basis for the articles and came away convinced of the truthfulness of the contents with regard to Applegate. Therefore, it cannot be argued that PNI is immune from liability for the actions of its agents/employees/reporters. See *Catalfo v. Jensen,* 628 F.Supp. 1453, 1455 (D.N.H.1986) ("... every person who directly or indirectly publishes or assists in the publication of an actionable defamatory statement is liable for the resultant injury." (Citations omitted)); see also *Michaelson v. Exxon Research & Engineering Co.,* 629 F.Supp. 418, 422 (W.D.Pa.1986) (Principal is liable for defamation so long as agent was apparently authorized to make defamatory statement).

It cannot be discounted that at one stage of the trial, even defendant's attorney agreed with the trial court that " ... knowledge of Greg Walter [is] the knowledge of Philadelphia Newspapers, Inc."

complained-of articles with actual malice, i.e., with knowledge that they were false or with reckless disregard of whether they were false. *Sullivan, supra; Corabi, supra; Curran, supra.*

The material which the jury found to be legally offensive would appear to begin with *The Inquirer* publication of March 25, 1973, written by Greg Walter and titled: "Ex-Official Denies Report Linking Sprague to 'Pratko' ", with a follow-up caption—"Report Linking Sprague, 'Pratko' Is Denied"—appearing on another page carrying a continuation of the story.[10]

Of the twenty-two paragraphs in the article, four specifically made reference to either Sprague or a named, former Justice Department official denying that he (Sprague) was using the alias "Nicholas Pratko", a name which surfaced during the court-martial of three State Troopers charged with wiretapping the phones of the Pennsylvania Crime Commission's investigation of purported police corruption in Philadelphia. "Pratko" was to have been in constant contact with the former State Police Commissioner, Rocco Urella, Sr.

The connection with Sprague came by way of a report prepared by a State Policeman attached to the Crime Commission (Sgt. Matthew Hunt). The report detailed that, according to informed sources, a telephone operator at the State Police Academy volunteered that " 'Pratko' was Richard Sprague."

Two days later, *The Inquirer* carried a story by Howard S. Shapiro—"Witness Ties Sprague To Mystery Figure in Trooper Wiretap Case"[11]—tying Sprague to "Pratko" through Sgt. Hunt's testimony at the court-martial proceedings. He was to have stated that a confidential source told him that "Pratko" was thought to be Sprague. In the second column of the article, it was reported that Sprague "vigorously" denied any link to "Pratko".

10. See Appendix.

11. *Ibid.*

On March 31, the same reporter wrote a sequel in which he noted that a decision on the court-martial would be forthcoming. He also recounted how Sprague had been mentioned by Sgt. Hunt as using an alias in the registration of a vehicle found at the motor lodge where the wiretapping took place.[12]

A second set of articles was preceded by an exchange of communiques beginning with a March 14, 1973 telegram asking Sprague interrogatories regarding the death of John Applegate. The next day, Sprague responded to the executive editor (Eugene L. Roberts, Jr.) of *The Inquirer* that his prosecution of one of the Yablonski murder cases rendered it "impossible" to answer the detailed questions posed by Pollock and Walter. He also mentioned his prosecution of Walter, the pending appeal thereof, and reports from "reliable" individuals that the reporter was "out to get" and "smear" him. He did state, however, that upon completion of his work he would answer any questions.

A second telegram, dated March 16, consented to a delay. Sprague responded by letter on March 28. In it he reasserted that Walter was out to "smear and destroy" him, and those individuals who were present when these remarks were allegedly made were named. He also referred to the "Pratko" serials. In closing, he denied any wrong-doing in the handling of the Applegate matter, and was willing to have it examined by an "impartial, independent individual."

In answer, Roberts wrote on March 29 that Walter's involvement in the story would be to "aid" Pollock, with the writing reserved to Pollock. Roberts also stated how the prosecution of Walter had been questioned by *The Inquirer* and how Sprague's feeling, that a reporter once charged should not participate in a story about his prosecutor, caused him "concern."

The next salvo came from Sprague. He responded in a letter of even date that his purpose was to convey the possible motivation behind Walter's "malicious" statements,

12. *Ibid.*

and, as for Pollock's fitness, he concluded not to allow Pollock an interview either, after being advised by one of his contacts that Pollock had said: " ... we are out to get Sprague." As a result, Sprague's willingness to be interviewed would have to occur in the absence of both Pollock and Walter.

Roberts' retort was in the form of a second letter in as many days that to acquiesce to a public official's objection to a specific reporter covering a story would be to render the official a "de facto" editor of *The Inquirer*. This he could not approve.

Roberts repeated his request that Sprague submit to questioning by Pollock and, this time, one Aaron Esptein. If there was no reply, whatever story had been prepared would be run with a notation as to Sprague's reasons for declining to talk.

True to his word, *The Inquirer* published thereafter two articles, both under the byline of Pollock and Walter. The first, printed on April 1, was headlined: "Did Sprague Quash Homicide Case as Favor to Urella?" "Sprague, Urella Tied to Wiretap, Homicide Cases." [13]

The introductory paragraphs to the approximately two-and-one-half-page, five-column story intermingled the "Pratkc" incident with the Applegate homicide. It then proceeded to "link" Sprague and Urella, Sr. to the wiretap incident, with a denial by Sprague. The article then discussed what transpired subsequent to Applegate's death, e.g., Sprague's late-night drive with Urella, Sr. to police headquarters and his participation with police in deciding not to prosecute Urella's son. Continuing, the writers recited in detail the facts surrounding the homicide, as garnered from those present and a so-called "official report" attributed to Sprague, to which repeated references were made as being deficient when compared to and inconsistent with respect to the witnesses' accounts of the incident.

13. *Ibid.*

The article described Urella, Jr.'s roommate's discharge at the magistrate hearing as coming at Sprague's urging. And, it was reported that Sprague boasted after the homicide to one of his friends, who gave a sworn statement of the same to *The Inquirer*, that "he 'could get anything [he] want[ed] from Rocco Urella.' "

The second *Inquirer* story of note appeared April 2, and sought, again, to associate Sprague with the wiretapping controversy surrounding Urella, Sr.[14] In the second and fifth paragraphs, according to sworn testimony given before the Crime Commission by a receptionist in Urella's office, Sprague was "in constant touch" with Urella.

The other article and editorials in *The Inquirer* add little to the manner in which Sprague was portrayed in the writings already discussed. Thus, although we will not make specific reference to them, we nonetheless, are cognizant of their existence.[15]

At trial, Sprague attempted to prove that the articles and headlines cited were false, that PNI was aware of their falsity or, in the alternative, acted in reckless disregard of their truth or falsity by failing to determine their accuracy.

While Sprague was on the stand, he denied any involvement in the "Pratko" affair or engaging in any impropriety with regard to the Applegate case. In particular, Sprague, in reference to the April 1 article, denied the existence of any "Sprague report" and refuted the non-existence of homosexual charges against Applegate by quoting from the summarization sheet in the Philadelphia police homicide file (criminal extract # 260719) containing a conviction for sodomy in 1953 and a 1960 charge of solicitation that was still

**14.** *Ibid.*

**15.** The April 4, 9, 10, 19 & 28 editorials, as well as an April 8 article ("Sprague Releases Part of Death File To Defend Actions"), are objected to as false and defamatory in plaintiff's amended complaint. However, our reading of the record would seem to discount the reliance on these writings by the plaintiff as ammunition in his arsenal of evidence to prove "actual malice." Rather, we find that the *thrust* of the plaintiff's defamation case centers upon the articles appearing in *The Inquirer* on March 25, 27, 31 and April 1 of 1973.

outstanding as of the time of Applegate's demise. The file also disclosed, contrary to the same article, that Urella, Jr. and Funk (Applegate's roommate) were administered lie-detector tests and passed.

Sprague steadfastly maintained that at no time did he try to cover-up Applegate's death, which was preceded by an innocent meeting of the victim by Urella, Jr. and Scalessa in a bar. A subsequent trip to the victim's apartment, under the pretext to secure a woman and more alcohol, ended in Scalessa striking him on the face for making a homosexual remark and lunging at Scalessa to prevent departure.

Sprague stated that because in his own mind he questioned whether Scalessa was saying he threw the punch at Applegate to protect Urella, Jr., he requested they take lie-detector tests, and, also, that LaSalle students be asked what Scalessa might have said to them regarding the incident before the news of the death became public. This was done and a pattern of consistency emerged supportive of who struck Applegate, i.e., Scalessa and not Urella.

As for the specific content of the April 1 article, to which reference has not already been made, Sprague denied that: 1) he "declined to prosecute" Urella; 2) he recommended no prosecution "despite objections by the police"; 3) he was in "constant touch" with the then Commissioner Urella as to the investigation being conducted by the State Crime Commission; 4) he was "in conference" an entire day with Urella at Urella's Delaware County home four days after the wiretaps were discovered; 5) he refused to be interviewed by *The Inquirer;* 6) unanswered questions existed about Applegate; 7) in 1971 he was a Special Crime Commission Investigator in Delaware County to look into corruption after Urella left office; and 8) he "urged" magistrate to discharge Scalessa—only "recommended". Lastly, as for Urella's late-night drive of Sprague to the police station, Sprague had no specific recollection.

As for the "Pratko" connection, Sprague produced an April 5 news release issued by the executive director of the Pennsylvania Crime Commission disavowing any knowledge

by the Commission that "Pratko" was an alias of Sprague's. To the same effect, a letter from the Commissioner of the Pennsylvania State Police indicated that a conversation with Sgt. Hunt had produced no information to the contrary.

In an accompanying letter, Sgt. Hunt recounted how he had been "abruptly interrupted" at the court-martial proceedings, wherein he made mention that a confidential informant "thought" that Sprague was possibly utilizing the code name "Pratko," so as not to be able to elaborate further that he had personal knowledge of who "Pratko" was, and that it was not Sprague.

To place matters in perspective, it requires mentioning that in 1972 the Commission was investigating the Philadelphia police department, and Sgt. (now Lieutenant) Matthew E. Hunt—working for the State Attorney General—was field supervisor for the Commission's agents looking into corruption in the City of Philadelphia. One of his duties related to the now ill-fated wiretapping incident of the Commission's agents in a Montgomery County motor lodge that resulted in the court-martial of three state troopers.

Furthermore, Officer Edward J. Brooks, in charge of investigating Applegate's death, stated that Sprague did nothing to "interfere" with the case or the conclusions he drew from the evidence. As he remarked, there was only one thing different Sprague did that had not been done before, i.e., he asked that Urella, Jr. and Scalessa be given a polygraph. In 1963, it was the practice of the police that where an individual admitted to the commission of a crime, one could "almost positively" say that "you didn't polygraph." Yet, Sprague went that additional step.

Harry G. Fox, Chief Inspector of Detectives in 1963, echoed Brooks' sentiments that Sprague made no effort to influence the investigation or his decision-making. He did offer that because everyone knew Urella, Sr., they tended to do "something more than we do ordinarily." He opined that if Urella, Jr. had not been the son of a policeman, he would not have been arrested, and, probably, Scalessa would not have been arrested either because, basically, of

the recommendation of the assistant district attorney, Sprague.

Both witnesses agreed that a right to re-arrest existed but was not exercised following Scalessa's discharge by the magistrate.

Upon the evidence presented, the trial court determined initially, as it was obligated to do under the law (see *Corabi, supra*), that the "Pratko" and Applegate publications were susceptible to a defamatory meaning. The jury's verdict reflects a concurrence.

We have no quarrel with the preceding conclusion, nor with the finding of falsity as to Sprague's involvement in the "Pratko" episode or his "quashing" of the Applegate case as a favor to Urella.

■ Having determined that the printed word was both false and defamatory, we need to decide whether PNI was guilty of doing so with "actual malice." See Concurring Opinion of Justice WHITE in *Dun & Bradstreet, Inc., supra,* 105 S.Ct. at 2949, citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) and *Sullivan, supra.* The task is not an easy one, and never has been since *Sullivan,* in striking a balance between the public's interest in being fully informed about public officials and public affairs and the competing interest of those who have been defamed in vindicating their reputations.

The United States Supreme Court has given us some direction in this area in its recent decision of *Bose Corp., supra.* It wrote there:

> The burden of proving "actual malice" requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement. See, *e.g., New York Times v. Sullivan, supra,* 376 U.S., at 280, 84 S.Ct., at 726; see also *Gertz v. Robert Welch, supra,* 418 U.S., at 342, 94 S.Ct., at 3008; *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); see

generally W. Prosser, Handbook on the Law of Torts 771–772, 821 (4th ed. 1971).

466 U.S. at 511 n. 30, 104 S.Ct. at 1965 n. 30.

■ To start with, after culling the relevant adjudicative facts, we have been unable to uncover "clear and convincing" evidence that PNI had knowledge that what it published was false. We are left, therefore, as phrased most aptly by Sprague's counsel early on in the trial as the parties met in chambers, with "the issue [of] whether they acted in reckless disregard of the truth." See *Sullivan, supra,* 376 U.S. at 280, 84 S.Ct. at 726; Anno., Libel and Slander: What Constitutes Actual Malice, Within Federal Constitutional Rule Requiring Public Officials and Public Figures to Show Actual Malice, 20 A.L.R.3rd 988, § 4[a].

Federal cases have provided guidance to the states in defining a "reckless" publication. In *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), the necessity for a showing that "only those false statements made with the high degree of awareness of their probable falsity demanded by [*Sullivan* ]" was emphasized. 376 U.S. at 74, 86 S.Ct. at 216. "Reasonable-belief" was not equated with the "reckless-disregard-of-truth" standard. The test enunciated by *Sullivan* is not that of ordinary negligence; and defeasance of the privilege is conditioned, not only on negligence, but also on reckless disregard for the truth. *Id.;* Anno., 20 A.L.R.3rd 988, § 4[a] at 998–99.

The most expansive effort to elaborate on the scope of "reckless disregard", as applied to the First Amendment dissemination of information, came in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). The Court admitted that the perimeters of the phrase just mentioned would evolve through a case-by-case adjudication. It then proceeded to discuss:

Mr. Justice Harlan's opinion in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 153, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967), stated that evidence of either deliberate falsification or reckless publication "despite the publisher's awareness of probable falsity" was essential to re-

covery by public officials in defamation actions. These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

390 U.S. at 731, 88 S.Ct. at 1325. An example of the manner in which the "reckless" standard is to be applied is reflected in *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

*Hill* dealt with an article in Life Magazine about a family being held hostage by convicts, which, according to the article, became the subject of a novel and subsequent play. In the article, members of the Hill family were depicted as physically and sexually abused. However, an interview with Mr. Hill stressed that their captors treated them courteously.

Life's article became the subject of a suit premised upon a New York statute which gave a person a right of action when his name (used to promote the sale of goods without proof of consent) was the subject of a "fictitious" report or article.

Of interest is the Supreme Court's reference to a Court of Appeals' decision in that state as an aid to understanding the construction being given to the statute. In the course of analyzing that ruling, the *Hill* Court observed that minor errors did not constitute "fictionalization". According to the State's highest court, *material and substantial* falsification was the test.

It is germane that the United States Supreme Court did not equate "material and substantial" falsification with "proof of knowledge of the falsity or that the article was prepared with reckless disregard for the truth", which it unequivocally stated "is also required." 385 U.S. at 386–87, 87 S.Ct. at 541. To the extent New York's highest court

endorsed another (lesser) standard of proof, *Hill* found it to be inconsistent with the constitutional protection afforded the press and speech alike.

Time, the publisher of Life, defended on the basis that the article was of legitimate public interest and was published in good faith without any malice whatsoever.

At trial, the author denied that he had knowledge from the start that the play had no connection to the Hill situation, aside from being a hostage incident. Although stating that the play was "between a little bit and moderately fictionalized", the author thought that the "heart and soul" of the play was the Hill incident. Albeit reversing for the trial court's injection into its instructions the element that liability could be premised upon "some incidental mistake of fact, or some incidental incorrect statement", the *Hill* Court did observe:

> The jury might reasonably conclude from this evidence— particularly that the New York Times article was in the story file, that the copy editor deleted "somewhat fictionalized" after the research assistant questioned its accuracy, and that Prideaux [the Life writer] admitted that he knew the play was "between a little bit and moderately fictionalized"—that Life knew the falsity of, or was reckless of the truth in, stating in the article that "the story reenacted" the Hill family's experience. On the other hand, the jury might reasonably predicate a finding of innocent or only negligent misstatement on the testimony that a statement was made to Prideaux by the free-lance photographer that linked the play to an incident in Philadelphia, that the author [of the novel and play] Hayes cooperated in arranging for the availability of the former Hill home, and that Prideaux thought beyond doubt that the "heart and soul" of the play was the Hill incident.[11]

[11] Where either result finds reasonable support in the record it is for the jury, not for this Court, to determine whether there was knowing or reckless falsehood. Cf. *New York Times Co. v. Sullivan,* supra, 376 U.S. 284–285, 84 S.Ct. 728–729, 11 L.Ed.2d 686.

385 U.S. at 393–94 & n. 11, 87 S.Ct. at 545 & n. 11; cf. *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986) (Role of jury in libel case reaffirmed (i.e., weighing of the evidence and drawing of legitimate inferences from the facts) once trial court determines that a reasonable factfinder could conclude that plaintiff has shown actual malice (in the pleadings) with convincing clarity sufficient to overcome a motion for summary judgment under Fed.R.Civ.P. 56(c)).

With the preceding in mind, we will examine the trio of "Pratko" articles. The first was written by Walter on March 25, 1973 and, in the headline, denied any connection between Sprague and "Pratko" on the word of an ex-official.

In the body of the article, no less than seven (7) references are made to Sprague not being "Pratko." When the story does discuss the two names as being the same person, it does so in respect to a report written by Sgt. Matthew Hunt.

Neither Sgt. Hunt, nor the attorney who cross-examined him at the court-martial, denied the elicitation of testimony that a confidential informant (telephone operator) had told Hunt that the name "Pratko" was being used by Sprague. Hunt also admitted in January of 1973 he gave a routine statement to State Police investigators that he had a source who believed Sprague to be "Pratko." This statement/report was used to cross-examine Sgt. Hunt on the existence of a confidential informant linking Sprague with "Pratko" —Hunt admitted to this "reluctantly" at the court-martial, and testifying thereto only after being ordered to do so by the review board.

■ Based on what was said and in light of what was written, we fail to detect how the newspaper's qualified privilege, in giving an accounting of a court-martial proceeding, was lost in the absence of "clear and convincing" proof that anything other than a "summary of substantial accuracy" was reported. See *Curran, supra; Binder v. Triangle Publications, Inc.,* 442 Pa. 319, 275 A.2d 53 (1971); *McAndrew v. Scranton Republican Pub. Co.,* 364

Pa. 504, 72 A.2d 780 (1950); Restatement (Second) of Torts, § 611.

We see no reason why the same qualified privilege would not apply to the second "Pratko" article of March 27, provided, of course, it was "a substantially correct account of the proceedings." Restatement (Second) of Torts, § 611, Comment *f.* We find it to be so.

We see that the introductory paragraph depicted Sgt. Hunt as "reluctantly" linking Sprague with "Pratko", a matter of which we have already made note, and corroborated by the attorney who extracted the admission at the hearing. The second paragraph recounted Hunt's testimony of his informant that Sprague was "Pratko", a fact that did transpire at the hearing, but which in the remaining article was off-set by accounts that a trooper had assigned a vehicle under the alias of "Pratko" to Corporal Metro Kardash, that the informant's statements were hearsay and maligning by inference, and Sprague's "vigorous" denial.

We have read the testimony of Sgt. Hunt, against the story printed, and do not find evidence of "actual malice" on the part of PNI in its March 27 publication.

As for the March 31 article, Howard S. Shapiro, who penned the second article, admitted there was an inaccuracy between his "hard" copy and the story which appeared in the paper.

His original read: "... Hunt ... linked Sprague's name to *an alias who allegedly* is registered to the unmarked State Police car used in the bugging incident." (Emphasis added) The actual article provided: "... Hunt said Sprague *allegedly* had used an alias in the registration of an unmarked State Police car linked to the bugging incident." (Emphasis added) According to Sgt. Hunt's testimony at trial: "The second paragraph is false."

Further, Sgt. Hunt and Paul C. Van Grossi—Trooper Metro Kardash's attorney at the court-martial, confirmed that a Trooper Kury, whose job it was to issue and keep track of vehicles assigned to undercover troopers, testified

at the hearing that Kardash was issued a vehicle in the name of "Pratko". Interestingly enough, this was cited in Shapiro's March 27 article, along with the fact that the police found at the wiretap location a type of vehicle (a coupe) that had been registered to "Pratko." Neither fact was discussed in the later article.

Additionally, Shapiro said he had juxtaposed "hearsay evidence" with "Richard Sprague." Again, this was not published in the final article.

When Shapiro was asked at his deposition why he did not mention Sprague's denial in the March 31 writing as he had in the March 27 piece, he responded: "I did not put that denial in that story, and I don't know why." Moreover, the deponent-Shapiro agreed with plaintiff's attorney that the changes made by the city editor the day of publication were "significant", and, in the case of the re-write of "allegedly" by the same man, that was tantamount to "an inaccuracy".

■ We have no hesitancy in holding that the actions of PNI (through its agents/servants—copy editors and Shaprio) are not synonymous with innocent or negligent misstatements.

The originator of the March 31 article used *specific* language to convey his thoughts of what transpired at the court-martial hearing. The re-write, which excised "hearsay" and realigned "allegedly", connotes a meaning other than that initially intended.[16]

■ Instantly, unlike *Time, Inc. v. Hill, supra,* the trial court did properly instruct the jury that the determination of liability had to be premised upon "clear and convincing" evidence of a knowing or reckless falsity. As acknowl-

---

**16.** *Corabi, supra,* 441 Pa. at 466, 273 A.2d at 916 ("... the passages selected for deletion and modification, even though sometimes small, can cause a dramatic change in the impression which the final article will generate in the minds of the average reader. And these editing decisions are calculated ones made by the editors to comport with the tone of the magazine desired."); see also *Time, Inc. v. Pape,* 401 U.S. 279, 292, 91 S.Ct. 633, 640, 28 L.Ed.2d 45 (1971) ("Nothing in this opinion is to be understood as making the word 'alleged' a superfluity in published reports of information damaging to reputation.").

edged and approved by *Hill,* we find it was for the jury to decide, under the particular facts here, whether the conduct of PNI (deletions, re-writes and omissions) altered the substance of the article of March 31 so as to rise to the level of "reckless" conduct violative of the countervailing right of a public official to his good name/reputation.[17]

Likewise, we conclude that it was for the jury to decide whether the April 1–2 articles were written with reckless disregard for the truth.

To explicate, the Applegate coverage had its genesis in December of 1972 when Walter received a "tip" that Sprague, ten years previously, had "covered-up" Urella's son's involvement in a murder case. During this same period, Walter had been dismissed by one paper and hired by *The Inquirer,* whose executive editor decided to move with "force" on this.

Walter's deposition reveals that once he located Applegate's roommate (Funk) in February of 1973, a tapped conversation took place, and was followed a month later by a phone interview to double-check the accuracy of the earlier meeting. Walter stated Funk was consistent on both occasions, i.e., Urella went into the bedroom with Applegate, and, when Urella came running out, Scalessa was on top of Funk, hitting him. Nowhere is this documented. In fact, this was countered by Scalessa's March 5 interview by Walter which placed Urella with him in the living room during the entire episode.

Prior to finding Funk, Walter interviewed Applegate's daughter (Nancy DeAngelis) and was informed that an aunt (Lillian, now deceased) had once mentioned that her father had "homosexual difficulties as a young man." This was consistent with the article that appeared in the March, 1963 edition of the *Evening Bulletin,* where it was written that Applegate had been convicted of sodomy in 1953 and was

---

**17.** Cf. *Time, Inc. v. Pape, supra,* 401 U.S. at 285, 91 S.Ct. at 637 ("... issue of malice was consequently one for the jury ... when the alleged libel purports to be an eyewitness or other direct account of events that speak for themselves.").

awaiting trial on a charge of solicitation to commit sodomy in 1960. This clipping was in PNI's file, known by the acronym RUDS (Rocco Urella—Dick Sprague).

PNI's efforts to secure local, state or federal confirmation of any conviction proved unsuccessful. However, the summary sheet in Applegate's criminal extract, which was read to Walter during his interview of the record's officer, documented this fact quite clearly. Also, the *Bulletin* reported that Urella and Scalessa had taken lie-detector tests. This was doubted by *The Inquirer*, and its inability to confirm this fact caused it to be questioned in the April 1 article.

Scalessa was interviewed on March 5, 1973 in Maryland, and he admitted to Walter that he hit Applegate. He was also interviewed on March 10, this time by phone. Scalessa was asked why he would have admitted to killing Applegate when it was clear that he did not. This conversation was reproduced in the April 1 article, and was conceded by Pollock as implying that Scalessa at some time had confessed to the homicide when, in actuality, that never occurred. At trial, Pollock stated that the question posed was somewhat "unfair." Further, Funk never accused Scalessa or Urella of murder.

Walter had stated he secured a statement from Funk, during the personal interview in New York, that Urella killed Applegate. Nowhere in Funk's deposition is there any discussion that either murdered Applegate, and, inexplicably, the tape-recording of the conversation with Funk could not be found by Walter. Nor did Walter's notes of the interview document this accusation.

Walter also disbelieved Scalessa's March 5 statement that he struck Applegate, and that he and Urella "were confronted with homosexuality" in the apartment because Walter believed Scalessa was made the "fall guy".

■ Scalessa, according to Walter, at some point said that Urella hit Funk. This was crucial in Walter's mind since Sprague had not prosecuted Urella because there was

no evidence that he struck anyone. However, Funk had never said that he had contact with Urella; he said he was hit by Scalessa. Nonetheless, Walter discounted Funk's recollection in this instance because Funk had been drinking on the evening in question. Yet, Walter placed reliance on Funk's story, which indicated to Walter that Urella struck and killed Applegate, because he "believe[d] the man." Is this evidence of selective news-reporting? [18]

Roberts was on the stand for over four days, and during that period, he recounted poring over the April 1 article paragraph by paragraph, and being convinced by Pollock's recitation of the sources for the statement(s) that the story was accurate. He offered that his only objective in circulating the article was to bring to the forefront what he perceived to be the questionable conduct of Sprague's handling of a case in which Sprague knew (was "very close" friends with) the father of one of the participants. [19]

18. We wish to lay one item to rest here. There were repeated accusations made and substantiated that Walter had a "vendetta" against Sprague, and he was "obsessed" with seeking retribution for the wiretapping conviction he had suffered at the hands of Mr. Sprague. Nonetheless, not one of the witnesses presented by the plaintiff could state that Walter intended to accomplish his deed by fabrication/falsehood. Thus, regardless of Walter's motive, such evidence would not transform itself into "actual malice." As the Supreme Court of the United States has observed:

[u]nder a rule ... permitting a finding of malice based on an intent merely to inflict harm, rather than an intent to inflict harm through falsehood, 'it becomes a hazardous matter to speak out against a popular politician, with the result that the dishonest and incompetent will be shielded.' Noel, Defamation of Public Officers and Candidates, 49 Col.L.Rev. 875, 898 (1949).

Garrison v. Louisiana, 379 U.S. 64, 73–74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). See Henry v. Collins, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965).

19. Is it not ironic that the paper would feel inhibited in the exercise of its discretion as to who should write an article when a reporter was objected to by a prospective interviewee as knuckling under and having others dictate the paper's reporting practices. Yet, the paper, in particular Walter, believed there was something inherently improper about an assistant district attorney prosecuting/investigating a case involving someone he/she knew, especially when the outcome was one of non-prosecution of the suspect. We sense a double-standard. On the one side the press is to have unbridled authority in the operation of its paper, as one of the penumbra of rights afforded by

As to the fabled "Sprague's official report", Roberts could not remember whether Pollock showed it to him. Roberts did believe that if Pollock had shown him a "piece of paper" and stated it to be the "Sprague official report", he would have felt that Sprague would have been entitled to an apology for associating his name to a document that had been repeatedly referred to in the April 1 article as woefully insufficient in substance and rebutted by reference to other evidence tending to cast a cloud of impropriety on Sprague's conduct in seeking and obtaining a dismissal of criminal action against Scalessa and Urella.

Roberts acknowledged that he had no reason to doubt the veracity of the *Bulletin* story of 1963 recounting the events surrounding the Applegate case, e.g., giving of lie-detector tests to Scalessa and Applegate, Funk not recalling falling down or being knocked over, and Sprague "recommending" there be no arrests. Curiously, Roberts stated that at no time did he or anyone from *The Inquirer* attempt to contact the *Bulletin* reporter responsible for the 1963 story. We refer to this merely as an aside, for we are quite well aware that what a defendant did, as compared to what it did not do, is the measuring rod against which its conduct is to be assessed. See *Sullivan, supra.*

While Pollock was on the stand, he gave information relating to the content of the RUDS file, and what he relied upon in writing about Applegate.

Pollock stated that he knew that the March 31 story was false, and he tried to rectify the matter in his April 2 article. When he denied that he had knowledge prior to the March 25, 27 or 31 articles that Sprague was not "Pratko", it was pointed out that he wrote a January 7, 1973 article (headlined: "Despite Denial, Urella Had Wiretapping Evidence") in which it was reported "Urella told Crime Commission investigators that Pratko was the undercover name of Met-

the First Amendment. On the other side, however, public officials are to be held up to public scrutiny with little recourse for publication of falsely or recklessly produced articles.

ro Kardash." No mention of this was made in the April 2 article.

At the time Pollock wrote the April 1 article, he stated that he did not know that Applegate was a homosexual. This is refuted by the record. For example, No. 27 in the RUDS file covered a notation about a Mr. Laughran, i.e.,

Called the Norfolk Apartments, Clearview Ave., spoke with Mr. Francis H. Laughran, owner. Very cooperative. His records show Franklin P. Funk and Applegate rented a sixth-floor apartment. He says it was general [sic] thought that the two men were homosexuals.

According to Pollock, the aforesaid was in the file, and "it would have been in February, probably, of 1973." Next, one of Applegate's two children told the reporters that her aunt informed her about homosexual problems encountered by her father during his childhood. Lastly, as for Applegate making a homosexual advance to either Urella or Scalessa, Pollock stated: "Mr. Scalessa had told us that that was the case, yes, sir. I believe it was also information contained in the March, 1963 Bulletin article." Notwithstanding this, Pollock included the following in the April 1 story: "But his death—along with the apparently untrue accusation that he had a record as a homosexual—was an extremely personal tragedy to his family."

There was evidence that only one of Applegate's children was interviewed regarding the homosexual charges which surfaced and were reported in the *Bulletin* in 1963. When confronted with the claim that what he wrote, based on what a single child had told him, was false, Pollock stated: "I wrote all the information I had; except, I grant you, this one particular point."

Pollock's attempt to render the matter innocuous by asserting that it was unintentional and an oversight was countered by Sprague's counsel by reference to Pollock's pre-trial affidavit, which was prepared by PNI's counsel:

... that the article of April 1, 1973, w[as] believed by me to be true and correct, and I possessed no knowledge, nor

any reason whatsoever to doubt the truth of any part of the aforesaid article.

In another instance, we observe that in one paragraph of the news article at issue, Pollock wrote:

Urella's son and a LaSalle College classmate were involved in a 1963 fight that led to the beating death of a forty-eight-year-old man, but Sprague recommended there be no prosecution despite objections by police.

When plaintiff's counsel inquired why the article reads as if the police "objected" to *both* (Urella's and Scalessa's) cases being dropped, the question posed was: "Did they [police] object to Mr. Sprague's recommendating that there was no basis for arresting Urella?" Pollock answered: "I don't know." He was asked further: "What objections did the police have with respect to Urella?" To this he responded: "None to my knowledge."

Nevertheless, Pollock persisted that the above-cited news article was to be read as: "There would be no prosecution of anyone, is what th[at] says, not that there was no prosecution specifically as to Urella." Thus, Pollock denied that he printed a known falsehood.

As to what "favor" was referred to in the legend: "Did Sprague Quash Homicide Case as Favor to Urella?", Pollock offered that:

There was a legitimate, logical question as to whether or not Mr. Sprague had kept the lid on that investigation as a favor to Mr. Urella.

At page 181 of Pollock's 1975 deposition, the witness answered the same question differently; viz.:

It is not now, nor was it then my suggestion that Mr. Sprague did any favor for Mr. Urella in order to receive favors in return.

Further, Pollock stated that in Scalessa's interview, he changed his story in response to questions asked by Pollock that it had earlier been reported that Rocco Urella, Jr. had not hit anyone. To this Scalessa answered: "Well, I don't know." This was not reported in the April 1 article, but it

was in Pollock's notes. Additionally, in the article, Pollock wrote about Applegate telling Scalessa "he was not going to leave until he blew him", and then in the next paragraph Pollock asked Scalessa: "Did he (Applegate) seem to be like a homosexual?" The answer was: "No." As to the approach taken by Pollock in his writing, the reporter did not dispute, on inquiry by the trial court and counsel for Sprague, that the way he wrote those two paragraphs were "misleading" as to Scalessa.

Lastly, Pollock acceded that the question put to Scalessa, and printed in the article, as to "Why did you say you did?"—referring purportedly to his admitting to killing Applegate on a prior occasion, was "a touch unfair."

■■ Based on the detailed accounting just recited, we believe the "actual malice" determination was a proper one for the jury. See *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *Time, Inc. v. Hill, supra; Bausewine v. Norristown Herald*, 351 Pa. 634, 41 A.2d 736 (1945). Thus, we affirm the denial of the judgment n.o.v.

■■ The final two points we wish to make concern the following. First, the award of compensatory and punitive damages must bear a "reasonable relation" to each other,[20] as articulated by the trial court in its charge to the jury, and approved by this Court en banc (*Kirkbride v. Lisbon Contractors, Inc.*, 357 Pa.Super. 322, 516 A.2d 1 (1986)). In other words, punitive damages are still awardable upon a showing of knowing or reckless falsehood. See *Herbert v. Lando, supra*, 441 U.S. at 160 & n. 6, 99 S.Ct. at 1641 & n. 6, citing *Gertz, supra*, 418 U.S. at 350, 94 S.Ct. at 3012.

---

**20.** It notes mention that even the *Gertz* Court found that state-defined standards of liability for defamation would not be approved where: "... juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused." 418 U.S. at 350, 94 S.Ct. at 3012. It cautioned that in only those instances where the *Sullivan* standard was met could one recover, in addition to damages to compensate a claimant for actual injury, punitive damages as well; anything less would entitle one to damages "to compensate him for actual injury" only. *Id.*

■ Second, we adopt the position taken by Judge Carson, in his dissenting opinion, that the adverse inference was inappropriate, the simple reason being that there was no evidence that the absent witness (Walter) was anymore accessible to the defendant than he was to the plaintiff. Quite the contrary, in-chambers discussions indicated that Walter was in court at the direction of defendant's counsel, who was asked to make him available for questioning by plaintiff's attorney. This did occur, but the plaintiff never exercised his opportunity to inquire of the witness when he had the occasion to do so. He will not be heard to complain now. Moreover, Walter was deposed and his questioning generated over 450 pages of transcript. We would wonder what more could be asked of the witness that had not already been put to him during his deposition.

■ In conclusion, finding that the Shield Law of this Commonwealth was violated by not applying it to the case at bar, we reverse and remand for a new trial.[21] Jurisdiction is not retained.

**21.** Some of the remaining issues proffered by PNI relate to the adequacy of the trial court's instructions to the jury, i.e., 1) in not defining clear and convincing evidence as requested in PNI's point for charge number one; 2) in stating damages need be proved only by a preponderance of the evidence; 3) in not instructing that presumed damages could not be awarded absent clear and convincing evidence; 4) in not charging on nominal damages; and 5) by inadequately charging on punitive damages.

The trial court properly denied No. 1. Inasmuch as PNI's point for charge would have required that the evidence had to be "Free from doubt", this was a higher standard than that required in criminal cases. Thus, this was inconsistent with the intermediate level assigned to the clear and convincing standard by the United States Supreme Court in libel cases. See *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (Clear and convincing standard falls between preponderance of the evidence and beyond a reasonable doubt criteria).

No. 2 would appear to be inconsistent with *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), that state-defined standards of liability for defamation cannot fall below the "actual malice" criterion of *Sullivan* and still be held valid. Therefore, albeit *Gertz* dealt with a private-individual libel suit, we see *no* reason why the logic underpinning its application for awarding punitive damages would not justify its utilization in public official/figure

## APPENDIX

### The Philadelphia Inquirer
### Sunday, March 25, 1973
### Ex-Official Denies Report Linking Sprague to 'Pratko'

By Greg Walter

*Of The Inquirer Staff*

Allegations that First Assistant District Attorney Richard A. Sprague was actually the mysterious "Nicholas Pratko" involved in the State Police wiretapping scandal were countered Saturday by a former State Justice Department official.

Walter L. Foulke, former executive deputy attorney general, said he had been told that "Pratko" was actually a code name for one of the three state troopers now being court-martialed on wiretapping charges.

"Pratko" has been mentioned at the court-martial as a code name used by someone who frequently contacted former State Police Commissioner Rocco P. Urella at his Harrisburg headquarters.

THE NAME has also been linked to an unmarked state police car found at the George Washington Motor Lodge in King of Prussia last Nov. 28—the day after wiretaps were found on phones of the State Crime Commission.

The car was registered under Pratko's name, according to Commission sources.

The suggested link between Sprague and "Pratko"—which Sprague has vigorously denied—was made at the court-martial by Norristown attorney Paul C. Vangrossi while cross-examining a witness.

cases, i.e., to prevent the unnecessary exacerbation of the danger of media self-censorship.

No. 3 is remedied by the instruction on clear and convincing evidence necessary to establish damages, which, by necessity, would negate the award of presumed damages. *Gertz, supra.* As for Nos. 4 and 5, we find them not to be meritorious.

Any other issues not otherwise specifically dealt with in our discussion are deemed, given the result reached instantly, not to warrant in-depth review.

Vangrossi represents one of the three troopers being court-martialed, Cpl. Metro Kardash.

According to Foulke, who resigned his Justice Department post at the start of this year, Kardash himself may have been "Pratko." Foulke told The Inquirer:

"IN FACT, Urella told me personally that 'Pratko' was a code name for Metro Kardash." He added that Urella had refused to sign a statement to that effect.

Besides Kardash, the defendants in the court-martial are Lt. Stephen Luchansky and Cpl. Curtis Guyette. The three were members of Urella's so-called "palace guard."

The allegations against Sprague, Foulke said, "must be mistaken.

"I know of no such report. Unless there had been other developments since the first of the year, there is no definite report linking Richard Sprague to 'Pratko.' "

The Inquirer learned earlier Saturday that documents turned over by the Crime Commission to attorneys representing the troopers included a report written by state police Sgt. Matthew Hunt, who was attached to the commission.

Hunt's report detailed an interview with a telephone operator at the State Police Academy at Hershey. In that report, according to informed sources, the telephone operator volunteered "that 'Pratko' was Richard Sprague."

THE LEAD was subsequently abandoned, the Inquirer has been told.

Sprague, meanwhile, has called the report "an absolute absurdity. Whoever wrote the report should come out and say so publicly.

"My guess is that the lawyer cited the report during cross-examination as a way of showing the absurdity of the Crime Commission report," Sprague said.

Vangrossi, meanwhile, said Saturday that his questions at the court-martial were prompted by Hunt's report and a report made by Anthony Caldonetti, a trooper attached to the Crime Commission. He said he could not remember the

date of the Caldonetti report, but said that it mentioned nothing about Sprague.

VANGROSSI described Hunt's report "as a smoke-screen for something. I just don't know what it is."

Asked if he had been personally acquainted with Richard Sprague, Vangrossi replied that Sprague had been pointed out to him "once at a supper club."

The three troopers have been accused of wiretapping the phones of fellow officers at the King of Prussia motel during the Crime Commission's probe of alleged Philadelphia police corruption.

Caldonetti, however, testified on Friday that Luchansky was not among three men he said he saw fleeing from the motel room where the illegal wiretaps allegedly were found.

The prosecution is considering the theory that four persons—the three defendants and an unnamed civilian—did the tapping.

### March 27, 1973

## Witness Ties Sprague To Mystery Figure in Trooper Wiretap Case

### By HOWARD S. SHAPIRO
*Inquirer Harrisburg Bureau*

HERSHEY.—A key witness in the court-martial of three state troopers reluctantly linked First Assistant District Attorney Richard A. Sprague on Monday to the mysterious "Nicholas Pratko," a prominent alias in a wiretapping scandal.

Sgt. Matthew E. Hunt, commander of a state Crime Commission police unit investigating alleged police corruption in Philadelphia, told the court-martial board that a confidential informant "told me the name (Nicholas Pratko) was Dick Sprague, that he thought it was Dick Sprague."

An unmarked state police car registered to the Pratko alias was found at the George Washington Motor Lodge in King of Prussia last Nov. 28. Hunt's detail was headquartered at the motel, where their three trooper colleagues are charged with wiretapping the operation.

EARLIER Monday, Sgt. Paul Kury, a trooper who assigns vehicles with fictitious registrations to undercover agents, testified that the coupe was assigned to Cpl. Metro Kardash, one of the defendants.

Kardash's attorney, Paul C. Vangrossi, asked Hunt about the confidential informant's data over the objections of Maj. Robert Rice, state police prosecutor, who charged that the information is hearsay.

Hunt refused to reveal the informant's name.

Vangrossi produced a police report, filed by Hunt last January, which apprently spelled out the informant's details.

SPRAGUE HAS vigorously denied any link to the name or the incident.

After the testimony, lawyers from both sides huddled with court martial board president Maj. William Grooms in a noisy "private" sidebar conference.

"Somebody in the city of Philadelphia is being maligned here by inference in a situation that is grossly unfair," Rice was heard to say.

"Whatever was in the report was in the report," replied Wallace Worth Jr., attorney for Lt. Stephen Luchansky, another defendant.

"Well," Rice insisted, "I'd like it for the record that I object vigorously."

"You're ashamed of your own (State Police) reports, then," charged Vangrossi, "because that's what was in the report."

### March 31, 1973

## Final Decision on Trooper Wiretap Now Rests With Police Commissioner

### By HOWARD S. SHAPIRO
*Inquirer Harrisburg Bureau*

HERSHEY.—The outcome of the controversial wiretapping court-martial of three state policemen now depends solely on State Police Commissioner James D. Barger.

Both sides presented final arguments Friday morning and the three-man court-martial board, led by Maj. William Grooms, broke for lunch before going into private session to decide the guilt or innocence of the police officers.

But it is Barger who must make the final decision after reading the recommendations made by the board. By state police law, those recommendations will never become public.

Grooms said Barger "absolutely makes the final decision," and may choose to accept the court-martial board's recommendations or may reject al tribunal suggestions in the secret report. The board would arrive at recommendations sometime this weekend, Grooms predicted.

Because a court-martial is not a criminal proceeding, the most severe penalty would be expulsion of the troopers from the force.

The troopers—Lt. Stephen Luchansky and Cpls. Metro Kardash and Curtis Guyette—are accused of wiretapping phone lines used by 13 state policemen assigned to a state Crime Commission probe of Philadelphia police corruption.

Final arguments ended two weeks of charges and countercharges, with accusations of political overtones made by the defense at the final session.

Philadelphia's first assistant district attorney, Richard Sprague, also was mentioned during the court-martial.

Sgt. Matthew Hunt said Sprague allegedly had used an alias in the registration of an unmarked state police car linked to the bugging incident. Sgt. Hunt is commander of the wiretapped police unit.

The car appeared in the parking lot of the George Washington Motor Lodge, at King of Prussia, last Nov. 28. Hunt's unit was stationed at the motel, where the wiretapping had been discovered by a janitor the previous day.

Defense lawyers argued Friday that Guyette and Kardash registered under assumed names at the motel, but that no testimony or evidence charged the two with the installation of any wiretaps.

**The Philadelphia Inquirer**

**April 1, 1973**

## Did Sprague Quash Homicide Case as Favor to Urella?

*This story was written by Inquirer Staff Writer Kent Pollock following an extensive investigation by Inquirer Staff Writer Greg Walter and Pollock.*

First Assistant-District Attorney Richard A. Sprague, whose name was linked last week to former State Police Commissioner Rocco P. Urella in a wiretapping controversy, once declined to prosecute Urella's son in a homicide case.

Urella's son and a LaSalle College classmate were involved in a 1963 fight that led to the beating death of a 48–year-old man, but Sprague recommended there be no prosecution despite objections by police.

The wiretapping controversy began last November when men working directly for Urella were seen fleeing a King of Prussia motel after wiretaps were discovered on State Crime Commission investigators' telephones.

At the time, the investigators were probing Philadelphia police corruption—an investigation that both Sprague and District Attorney Arlen Specter have severely opposed since its inception.

JUSTICE DEPARTMENT sources have told The Inquirer that it has been substantiated that Urella's men were keeping tabs on the commission's Philadelphia investigation and that Sprague kept "in constant touch" with Urella during that time.

Sprague's name was linked to Urella during court-martial proceedings against three men who worked for Urella. Sprague has publicly denied any connection with the wiretapping.

Sprague's involvement with Urella Sr. became evident four days after the wiretaps were discovered when, The Inquirer learned, Sprague spent an entire day in conference with Urella at Urella's Delaware County home.

Sprague recently categorized his relationship to Urella as "very close, exceedingly close."

An extensive Inquirer investigation into the Sprague-Urella relationship and the 1963 homicide revealed that:

A MIDNIGHT TELEPHONE call was placed by Urella to Sprague shortly after Urella learned of his son's involvement in the homicide. Hours later, Urella drove Sprague to the police department's homicide division where Sprague, as chief of homicide for the District Attorney's office, was partly responsible for deciding not to prosecute Rocco P. Urella Jr.

SPRAGUE ACQUIESCED to police demands to prosecute Urella's classmate, but asked a magistrate to drop the charges. Urella Jr. did participate in the fight, but was never charged with any crime.

THE VICTIM'S ROOMMATE told police he was being assaulted by Urella Jr.'s classmate when the fatal assault apparently took place. Nevertheless, Urella's classmate was arrested. The victim's roommate was present at the magistrate's hearing, but wasn't called to testify by Sprague.

THERE ARE DISCREPANCIES between Sprague's official report, which makes no mention of Urella Jr. even as a witness, and comments he made at the time.

\* \* \*

The story begins unfolding at 10:30 P.M., Saturday, March 2, 1963. Here is the cast of characters:

ROCCO URELLA JR., 21, a pre-medical student at La-Salle College who lived off campus with his family. His father was then a captain in charge of the Reading State Police Barracks.

DONALD F. SCALESSA, 20, a classmate and buddy of Urella Jr. who lived on campus and is the son of a wealthy Washington, D.C. physician.

JOHN R. APPLEGATE, 48, a General Electric Company clerk and a patron at Charley's Bar, Broad and Clearview

sts., which was near his home at Norfolk Manor Apartments, 1415 Clearview st.

FRANKLIN R. FUNK, 47, a former clergyman working for the Philadelphia Transportation Company and Applegate's roommate.

Urella Jr. and Scalessa, who was under age at the time, entered Charley's Bar at about 10:30 P.M., where they met Applegate at about 1:30 A.M.

An hour later, the three left the taproom and—at Applegate's suggestion—went to Applegate's apartment to meet some girls and have a drink, according to statements made to police by Urella Jr. and Scalessa at the time.

Applegate's family and Funk have told The Inquirer that Applegate was a heavy drinker. In fact, he had been intoxicated earlier in the evening and Funk had urged him not to go out again.

Once inside Applegate's apartment, a fight began and Applegate was killed. His death certificate classifies the death as a homicide caused by brain damage "due to blunt impact to head."

According to Sprague's official report, Applegate arrived home and asked Funk to "break out the whiskey bottle for some drinks."

HIS REPORT continues: "Funk refused to get any bottle and then asked the two men (Scalessa and Urella Jr.) to leave the apartment, whereupon one of the men struck Funk, knocking him to the floor and splitting his lip."

Sprague's report says Funk got up off the floor and both men fled with Funk chasing them to the outside hallway. When Funk returned, the report says, he found Applegate lying on the floor and believed Applegate was "sleeping off his drunk."

When Funk awoke at about 8 A.M., Sprague's report says, he found Applegate in the same position and he realized Applegate was dead, so police were summoned to the apartment.

Scalessa was arrested eight days later on a general charge of homicide. That same day, he was taken before Magistrate Louis Vignola, who discharged the case at Sprague's urging.

Sprague told Vignola, according to newspaper reports, that he had urged police not to arrest Scalessa because a prima facia case had not been established. Vignola agreed.

AFTER THE HEARING, Sprague told reporters that Scalessa had hit Applegate when Applegate made an improper suggestion "under circumstances which gave the defendant the right to strike the deceased and protect himself."

Urella Jr. was not charged, Sprague told reporters, "because he did not strike anybody."

There is no mention of an improper suggestion by Applegate in Sprague's official report written at the time and still on file in the District Attorney's Office.

Further, Funk has told The Inquirer in a recent series of interviews that Scalessa was assaulting him (Funk) when Applegate was apparently assaulted.

Shortly after the trio arrived at the apartment, Funk related, Urella and Applegate went into the apartment's bedroom, where they remained until Urella and Scalessa fled.

Funk said Urella and Applegate might have gone into the bedroom to look for the liquor which was hidden. He wasn't certain, however.

Funk said it wasn't long after Urella and Applegate went into the bedroom that Scalessa jumped him (Funk) and began hitting and choking him, splitting Funk's lip in the process.

—Urella ran from the bedroom, Funk said, then Scalessa stopped hitting him and fled with Urella. Funk said he chased the two youths as they ran.

WHEN FUNK returned to the apartment, he said, Applegate was lying outside the bedroom door, apparently passed

out. Funk called a friend of his and asked her what he should do.

The woman, who also knew Applegate, told Funk to just let Applegate sleep off his drunk.

The next morning, Funk found Applegate in the exact same position and he realized his roommate was dead. He called a physician who came to the apartment and pronounced Applegate dead and told Funk to call the police, which Funk did.

There is no mention of Funk's telephone calls to his woman friend or to the doctor who pronounced Applegate dead in Sprague's official report summarizing the case.

Funk was taken by police to the department's homicide division where he was questioned most of the day of March 3 and given a lie detector test to determine whether he assaulted Applegate.

At that time, Funk related his entire story and was then released by police.

SEVERAL DAYS later, Funk said, police visited him and showed him an artist's drawing of Urella Jr. which Funk identified as the man he saw going into the bedroom with Applegate before Applegate died.

Funk also said he was present during Scalessa's hearing and was willing to testify, but Sprague never called him to testify.

"It was over in ten minutes," Funk said. "I was shocked."

Funk said he couldn't understand why he didn't see Urella at the hearing. Not understanding what was happening, Funk said he questioned Detective Edward Brooks, who had investigated the case, why Scalessa had assaulted him (Funk) if he was busy assaulting Applegate.

"I tried to get information out of Brooks. I said 'For goodness sakes tell me why I was hit' and he said, 'because you came to John's (Applegate's) aid. I don't remember that at all," Funk said.

Funk said he was certain of his identification of Urella because Urella had light hair while Scalessa—the man he vividly remembers attacking him—had black hair.

A check of admission photographs at LaSalle College shows Urella with light hair and Scalessa with black hair.

Scalessa was interviewed at his Glenn Burnie, Md., home where he is currently a real estate broker.

Question: "Was Funk ever struck by anyone?"

Answer: "Yes, he was."

Question: "By you or by Rocco?"

Answer: "By both."

Question: "Both of you struck him, why?"

Answer: "Because he was, well, when I struck him he was being struck by Rocco."

This portion of Scalessa's interview contradicts Sprague's claim that Urella was not arrested because "he did not strike anybody."

The police report on the incident says that Scalessa struck Applegate on the left lower jaw. "He (Applegate) fell to the floor on one knee and his elbow," the report says.

Detective Brooks testified at the hearing that Applegate had been convicted of sodomy in 1953 and was awaiting trial at the time of his death on a 1960 charge of solicitation to commit sodomy.

His testimony tended to support Sprague's claim that there had been some sort of "improper suggestion" by Applegate.

A search of Philadelphia police records, state police records, records in New Jersey where Applegate once lived and Federal records did not turn up any evidence of Applegate's ever having been arrested on any charge.

Applegate's children were shocked when they read in the newspapers the allegations about their father's homosexuality. Applegate had been engaged to be married a few years prior to his death, according to his daughter.

FURTHER, CHARLEY'S BAR, according to a bartender who said he knew the taproom's history, has never been a hangout for homosexuals.

In a recent interview, Philadelphia Medical Examiner Dr. Marvin E. Aronson said Applegate's death was caused by "traumatic sub-arachnoid hemorrhage and contusion of brain stem due to blunt impact to head."

After reviewing photographs taken of Applegate's body, along with autopsy reports, Dr. Aronson said the terminology "blunt impact" could mean a fist or some other object.

"In this case, I will tell you, there are also some superficial lacerations in the area where this injury took place ... it is possible that this was done with a fist, but it makes it not as likely," Dr. Aronson said.

The fatal injury, according to medical reports, was situated behind Applegate's left ear.

Scalessa told The Inquirer he had struck Applegate on the chin. At the time of his arrest, he told police the same thing.

During his Inquirer interview, Scalessa didn't relate anything about an argument over drinks being served by Funk.

"As soon as we got inside that door, we never had a drink, we never had anything, not a cigaret. Right away we were confronted with the homosexuality," Scalessa said.

He continued, "I said, 'Rocco, let's get out of here.' Funk said to me, 'No, I'm going to (commit a sex act) you first.' And I said, 'No, you're not' and I hit him and ran."

At a different point in the interview, Scalessa identified Applegate as the person who made the proposition.

Question: "Applegate made an advance at you verbally, or did he touch you?"

Answer: "In the apartment, verbally."

Question: "Did he (Applegate) seem to be like a homosexual?"

Answer: "No."

Question: "Did he touch you?"

Answer: "No."

Several days later, The Inquirer again interviewed Scalessa. It was suggested that Scalessa had not told the truth during the first interview.

Question: "It is quite clear that you didn't kill John Applegate ..."

Answer: "Well, I know that."

Question: "Why did you say you did?"

Answer: "I didn't."

Scalessa refused to answer further questions after being asked why he allowed himself to be blamed for a serious crime he did not commit. Earlier, he had told The Inquirer:

"I don't like delving back into it. It was something that happened years ago and I don't like thinking about it, let alone talking about it. It has no pleasantries at all. It's a disgusting thing and I don't really like to talk about it."

None of the other people involved, except for Funk, would comment on the case for The Inquirer.

Urella Jr. was reached by telephone in Bologna, Italy, where he is currently attending the University of Bologna Medical School.

"I have no comment ... no comment whatsoever," said Urella Jr.

Urella was told that Scalessa had said he did not kill Applegate.

"I have no comment," he said, then hung up.

Urella Sr. said, "This thing is ten years ago and it's ridiculous to even talk about it ... Mr. Sprague is a friend of mine and we've been professional friends for many, many years. I'm not going to get specific about any questions you're putting to me."

HE CONTINUED, "My son? Well, of course ... he didn't strike anybody. He was down there and ... it's all going back ten years ... I know this much, my son wasn't

involved and he wasn't charged with anything and he took a lie detector test to see if he was telling the truth as a witness and it showed he was."

There is no notation of Urella taking a lie detector test on the police department's summary of the case. Neither is there a notation of Funk taking such a test.

Homicide Capt. Arthur Matthews was questioned about the existence of lie detector test results and replied, "This (the summary) is all that is available."

Repeated attempts to interview Sprague were unsuccessful. On several occasions in correspondence to Inquirer Executive Editor Eugene Roberts, Sprague expressed a willingness to answer questions about the Applegate case.

But, nevertheless, he refused to be interviewed.

In one letter to Roberts, Sprague said, "There is nothing in the least improper that occurred in the handling of the Applegate case, and I would be happy to have that case reviewed by any impartial, independent individual."

ACTIVITIES SURROUNDING Applegate's homicide, documented by The Inquirer, indicate considerable involvement by Sprague as the District Attorney's Office chief of homicide, although he was the close personal friend of one of the suspect's father.

Scalessa's La Salle College classmates have told The Inquirer that Scalessa was "shocked" when he learned of Applegate's death from a newspaper account.

An article in the March 4, 1963, Philadelphia Inquirer was shown to Scalessa by a classmate because Scalessa had been bragging earlier that day about how he and Urella had beaten up a couple of men.

Scalessa called Urella, he told The Inquirer, then went to Urella's home where he discussed the situation with Urella Jr. and his father.

AT 12:55 A.M. ON MARCH 5, 1963—several hours after Urella Sr. first learned of his son's involvement in the homicide—Urella Sr. placed a call to Sprague's home.

Sprague was not in, but Urella left a message with Sprague's wife that it was important for Sprague to get in touch with him.

A private detective had been hired by Sprague's wife at the time to trace her husband's movements. The detective's report was later used in connection with a divorce proceeding brought by Sprague that is still pending.

The private detective reported that Sprague returned to his home shortly before 4 A.M. on March 5, 1963.

Later in the day, Sprague's wife asked him about the call from Urella because, she told The Inquirer, the Urellas had been friends for a number of years and she was concerned.

Sprague told his wife that Urella's son and another ... were involved in the killing of a center city man.

"I asked Dick (Sprague) what he had done. He said everything was 'taken care of,' " Mrs. Sprague said.

IT WASN'T LONG after Sprague had made the comment to his wife that Urella picked him up to go, Sprague told his wife, "to homicide."

Mrs. Sprague not only recalls the incident, but she kept detailed notes about it in a diary that she has shown The Inquirer to document her story.

This story has also been confirmed by another Inquirer source close to the Urella family.

A series of meetings followed between Sprague and police, according to what Sprague told newspapers at the time.

During one of the meetings, Sprague reported at the time, "The police department decided to arrest one boy (Scalessa). The DA's Office recommended there be no arrests, but the police department decided to go ahead."

Subsequent to the homicide, Sprague boasted to at least one of his friends that he "could get anything I want from Rocco Urella," according to a sworn statement by the friend obtained by The Inquirer.

THE SWORN STATEMENT also alleges that Sprague on several occasions was driven to a Pennsylvania resort area in Urella's state police vehicle by Trooper James McCann, Urella's state police driver.

McCann was recently suspended by Urella's successor, Commissioner James Barger, as a result of an investigation stemming from the intimidation of a witness in the wiretapping controversy.

Sprague and Urella's law enforcement careers have crossed paths many times since the 1963 homicide.

It was Sprague who was sent in 1971 to Delaware County as a special Crime Commission investigator to look into corruption shortly after Urella left his post there as chief of the county detectives.

MEANWHILE, John Applegate's family and his former roommate wonder why nobody was held accountable for his death.

John Applegate is now just a morgue number, along with thousands of others in the city's archives.

But his death—along, with the apparently untrue accusation that he had a record as a homosexual—was an extremely personal tragedy to his family.

"After I read about it," his daughter recently told The Inquirer, "I called up the man who put the stone on my father's grave and I asked him to add one more line:

"Rest in Peace."

### 'Leaked' Wiretap Data, Trooper Admits

**April 2, 1973**

By KENT POLLOCK And GREG WALTER
*Of The Inquirer Staff*

A state trooper assigned last year to the State Crime Commission's Philadelphia police corruption probe has admitted in a sworn statement that he leaked confidential information about the investigation to men working for

former State Police Commissioner Rocco P. Urella, The Inquirer has learned.

At the same time, state police sources say, a receptionist in Urella's office has given sworn testimony before the crime commission that Philadelphia First Assistant District Attorney Richard A. Sprague kept "in constant touch" with Urella.

erred in an extensive investigation into the illegal wiretapping of telephones used by commission investigators at a King of Prussia motel.

ALL FIVE MEMBERS of Urella's so-called "palace guard" have been suspended as a result of the wiretapping probe. Three of the men last week were defendants in a court-martial proceeding stemming from the incident.

The receptionist in Urella's office has given secret testimony that reveals that Sprague constantly called Urella for months prior to the wiretaps' discovery.

The receptionist's testimony has been turned over to state police investigators to help them piece together the entire story surrounding the wiretapping of crime commission telephones at the George Washington Motor Lodge.

SPRAGUE AND DISTRICT ATTORNEY Arlen Specter have publicly denounced the crime commission's investigation as being unnecessary. Philadelphia police foiled crime commission plans to set up surveillance on possible corruption activities.

In one celebrated case, a trooper working for the crime commission was arrested for pinching a waitress in a center city bar. The charges of assault, filed by the police, were later dropped by Specter.

A high state police source close to the investigation has told The Inquirer that Trooper Gerald T. DeWalt, who refused last week to answer questions during the court martial hearing, has given a sworn statement admitting his part in an elaborate effort to counter the crime commission's effectiveness.

DeWALT HAS, among other things, admitted tipping off Urella's men—in a clandestine way—that the wiretaps on crime commission telephones had been discovered.

DeWalt also admitted in his statement that Cpl. Metro Kardash, one of the three troopers facing court martial, had asked him many questions about the commission's activities, including what motel rooms were being used by commission investigators.

Three room numbers were given to Kardash by DeWalt, the trooper's sworn statement says. They were the rooms of supervisors Sgt. Matt Hunt and Cpl. Charles Todd, along with the room number of the investigators' "report room" from which information was telephoned to commission headquarters in St. Davids.

The telephones in these three rooms later were found to be wiretapped.

THE SCHEME to tip off Urella's men that the wiretaps had been discovered began at about 11 A.M. last Nov. 28, shortly after DeWalt learned that the wiretaps had been discovered, according to his statement.

He said he called his wife ... and told her to call Mrs. Marion Gobrecht, operator of the Sentinel Motel on Route 202, and tell her that the wiretaps had been discovered.

Urella is half-owner of the motel with Mrs. Gobrecht, according to the recorder of deeds office in Chester County courthouse.

Mrs. Gobrecht then called Urella in Harrisburg, but he was not in. She left an urgent message for him to call back. ...

The receptionist has told the crime commission that Urella returned to his office running, something she had never seen him do before.

Telephone company records subpenaed by the crime commission show long-distance telephone calls that support DeWalt's admissions. They also show contact between DeWalt and Kardash for a long time.

According to a commission memorandum detailing the crime commission's investigation, Urella has admitted receiving a telephone call for Mrs. Gobrecht. He told investigators, the memorandum says, that the telephone call was in reference to a bomb threat at the motel.

SHORTLY AFTER URELLA received the call from Mrs. Gobrecht, according to the commission memorandum, three separate telephone calls were made in the motel room where Urella's men were [allegedly intercepting] commission telephone calls.

The callers, according to commission testimony by the motel operator, told Urella's men to get out of the room.

It was then that three men were seen fleeing the room. They were chased, but not caught, by commission investigators. They were recognized as Urella's men, however, according to the memorandum.

\* \* \*

URELLA THEN DROVE at 80 miles an hour down the Pennsylvania Turnpike to meet the alleged wiretappers behind a huge cinder pile on Route 202 near turnpike exit 23, according to allegations in the prosecution memorandum.

Urella told crime commission investigators that Nicholas Pratko was the code name for Kardash.

A crime commission investigator testified during the court martial, however, that he had been told by a reliable informant that Pratko was a code name used by Sprague.

THE INFORMATION was contained in raw crime commission reports that were obtained and introduced at the court-martial by defense attorneys.